[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14151
_____

D.C. Docket No. 1:08-cr-00235-CC-JFK-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LONNIE WHATLEY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 3, 2013)

Before PRYOR and JORDAN, Circuit Judges, and PRO,[*] District Judge:

PRYOR, Circuit Judge:

_____

[*] Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

When asked why he robbed banks, legend has it that famed American bank robber Willie Sutton replied, "Because that's where the money is."  Bryan Burrough, Books: The Robber's Last Ride, Wall St. J., Sept. 29, 2012, at C6. Lonnie Whatley may have taken this advice to heart when he robbed four banks in the greater Atlanta area during 2003 to 2006 and attempted to rob another in 2007. In this appeal of his convictions for the robberies, Whatley asks us to resolve four issues: (1) whether the admission of 14 in-court identifications of Whatley by bank employees violated his right to due process; (2) whether the district court abused its discretion when it admitted evidence of Whatley's conviction for the attempted bank robbery as evidence of a modus operandi; (3) whether the district court abused its discretion when it declined to grant Whatley a new trial after the parties discovered that the jurors had considered extrinsic evidence during their deliberations; and (4) whether the district court erred when it applied a four-level sentencing enhancement for abduction of the bank employees because Whatley ordered the bank employees to move around to different areas within the banks. We conclude that, based on the recent decision of the Supreme Court in Perry v. New Hampshire, __ U.S. __, 132 S. Ct. 716 (2012), which requires no preliminary examination for an identification not arranged by law enforcement officers, the admission of the in-court identifications of Whatley did not violate his right to due process.  We also conclude that the district court did not abuse its discretion when

it admitted evidence of Whatley's conviction for the attempted bank robbery and that the district court did not abuse its discretion when it denied Whatley a new trial. But we also conclude that the district court erred when it applied the enhancement for abduction. We affirm Whatley's convictions, vacate his sentence, and remand for resentencing with instructions to apply the two-level enhancement for physical restraint of the employees instead of the four-level enhancement for abduction.

## I. BACKGROUND

Lonnie Whatley robbed four banks over a four-year period from 2003 to 2006. In 2007, he was apprehended after quick-thinking employees foiled his attempted fifth bank robbery. But for years Whatley apparently thrived as a professional bank robber.

On June 24, 2003, Lonnie Whatley robbed the South Trust Bank in Carollton, Georgia. He entered the bank at about 3:45 p.m., shortly before the 4:00 p.m. closing time. He wore a light blue and white basketball jersey over a t-shirt and baggy jeans. A bank teller, Amanda Budde, greeted Whatley, who said he wanted to speak with the financial services representative, Sandy Eidson. After Eidson finished speaking with another customer, she left her office to meet Whatley, and he identified himself as Kevin Williams. Whatley spoke with Eidson in her office for about 20 to 30 minutes about a variety of bank products, and he

3

asked about obtaining a small business loan to open a car wash.  Eidson walked

Whatley to the front door of the bank to let him leave because the bank had closed.

As they approached the door, Whatley told Eidson he needed "checking slips."

When they turned to retrieve some deposit slips, he brandished a firearm.  Eidson

later testified that it "had some shiny on it, metal" and "was sort of a flat

automatic-style gun versus with a round barrel, and it had a little red thing in the

back of it."

Whatley ordered the bank employees to put their hands up, and he ordered

the employees to get April Bell, another employee, out of her office.  He told the

employees not to press any alarms because he "wasn't going back to jail" and

"would put a cap in all of [them]" if they did.  When all of the employees were

assembled in the middle of the bank, Whatley ordered them to walk behind the

teller line and "get down on the floor tornado-drill style."  He jumped over the

teller line and screamed at the employees to stay in that position and not look at

him.  He instructed Bell to start gathering money from the teller drawers into a

blue nylon duffel bag with a "funny zipper."  Whatley told Bell not to give him any

bank or "blowup" money.  After Bell retrieved the money from the drawers,

Whatley asked the employees where the video surveillance system was and

directed the employees to walk to the break room area where the system was

located.  Whatley had the employees rewind the videotape to see if he was on it

4

and took it when he saw that he was.  Whatley then led the employees to the vault, where he forced the employees to gather more cash for him.  He told the employees to assume the tornado-drill position, and he approached each employee individually, placed his gun at the employee's neck, and ordered the employee to enter the inner vault.  Whatley instructed Eidson to gather everyone's keys and put them outside the metal vault door, and then he rubbed his gun on her backside and told her that he knew who she was and would kill her if she told anyone.  When Eidson joined her fellow employees in the inner vault, Whatley tried, but failed, to close the outer metal door.  He tried to open the inner vault door, but the employees had locked it from the inside.  Whatley left the bank with $81,712.50.  Law enforcement received reports that the suspect fled in a black Chevrolet Impala or Malibu with nice rims.

Ten months later, on April 23, 2004, Whatley robbed the Wachovia Bank in Hiram, Georgia.  He entered the bank around 3:55 p.m., one hour before closing.  Whatley wore a baseball cap, a dark t-shirt, jeans, and black boots.  After he waited for some time, a financial adviser, Vickie Hart, asked Whatley if she could help him, and he requested information about a small business loan to buy a car wash.  They spoke for a while before Hart told Whatley that he should try to obtain that loan from the Small Business Administration.  But Whatley stayed around the lobby and then asked Hart whether he could speak to her privately.  They sat in her

office for some time before Whatley pulled out latex gloves, closed the door to the office with his foot, and revealed an 18-inch gun with a shoulder strap that looked like it had automatic-fire capabilities. He threatened to shoot Hart and told her to continue acting as if she were working on his file. When another bank teller, Whitney Gable, approached the office, he told her to enter and stay with Hart.

Whatley directed the two women back to the main area of the bank. He announced, "This is a robbery," covered the bottom half of his face with a kerchief, and instructed the employees to lie on the floor in the middle of the bank as he jumped over the teller line to get cash out of the teller drawers. He asked where the videotapes were and made the employees crawl into the vault area where they opened the vault for him, and he loaded cash into a blue duffel bag. He told them that he did not want any dye packs or recorded money. He then forced the employees to crawl into the video surveillance room to retrieve the videotapes for him. During this time, Whatley was speaking on his cell phone to a woman who instructed him not to forget the videotapes. Whatley then wanted to put the employees back in the vault, but the employees told him that, because they had already locked the vault, an alarm would sound if they opened it. At Hart's suggestion, Whatley ushered the employees to the windowless men's bathroom, and Whatley pushed a folding table up in front of the door and told the employees to wait 15 minutes to exit. He left the bank at about 5:35 p.m. with $142,246.

6

Fifteen months later, on July 5, 2005, Whatley entered the SunTrust Bank in Woodstock, Georgia, at about 3:45 p.m., 15 minutes before closing time. He was dressed in a light colored shirt, blue jeans, black shoes, and a baseball hat. He met with Ananda Admiral, a financial services representative, and discussed checking accounts and safety deposit boxes for about 15 minutes. Near closing time, Whatley slipped Admiral a note that used the words "robbery" and "kill." He told Admiral to pretend that she was working while he asked her several questions about the number of employees in the bank, the keys to the vault, and the surveillance videotapes. Whatley told Admiral to get her manager, Chris McMahon, and Whatley informed McMahon that it was a robbery.

Whatley then left Admiral's office and instructed McMahon, Admiral, and another employee they encountered to go to the safety deposit room. There, he explained to the employees that they were going to go to the teller line to get cash. When they walked to the teller line, a teller there seemed confused about what was happening, so Whatley rushed her with the gun and told her to "[o]pen the door, bitch." By then, Whatley had covered the bottom half of his face with a bandana and put on latex gloves. He ordered the employees to lie down on the floor while one of the tellers collected money from the teller drawers and placed it in a navy blue duffel bag. After the teller collected the money from the drawers, Whatley ordered the employees to the kitchen area, where he retrieved the security tapes.

7

Whatley then moved the employees to the vault area, where he instructed them to lie down while he emptied the contents of the vault into the duffel bag and garbage bags that he had produced. Although Whatley wanted to leave the bank immediately, he had to wait for someone to exit the parking lot. He made several threats to kill the employees and himself before he escaped with $281,469.

Fifteen months later, on October 18, 2006, Whatley entered the Wachovia Bank in Douglasville, Georgia, at about 4:10 p.m., less than an hour before the 5:00 pm closing time. Whatley wore a light-colored shirt, jeans, a baseball hat, and boots. He approached the manager, Sheri Wylie, and asked for assistance in converting his money market account into a checking account and obtaining a loan. She asked him to wait, and Corey Hackett, a financial specialist, came out to assist Whatley about 10 minutes later. When Hackett and Whatley went into Hackett's office, Whatley handed him a long handwritten note, the first sentence of which said, "This is a robbery, keep your hands on the table." Whatley then asked Hackett a series of questions about the vault, the cameras, the exits, and whether there was a shade to pull down by the drive-through window. Whatley instructed him not to look at his face. Whatley sat in Hackett's office for 30 minutes, until all of the customers had left.

At closing time, Whatley instructed Hackett to get Wylie. When Wylie arrived in the office, Whatley had put on latex gloves. He displayed a firearm

8

tucked into the waistband of his pants and told her, "If you value the lives of your employees and your life, you'll do everything I say." They proceeded to the main area of the bank and Whatley jumped on top of the teller counter and drew his firearm. The firearm was described as an all-black handgun that resembled a nine millimeter. He ordered the tellers to come from around the counter, and he pointed the gun at the head of one of the tellers and said, "You pushed the F'ing button, didn't you? Tell me the truth, you pushed the F'ing button, didn't you?" The teller became hysterical and insisted that she had not pushed the button. Hackett asked Whatley whether he was going to kill them all. Whatley replied that, if everything went his way, everyone would be fine, but if anything went wrong, he would kill everyone in the bank including himself. Whatley pulled down the shade over the drive-through window and ordered everyone to the floor as the police made a routine drive-by of the bank. After the police car passed the bank, Whatley began to load money from the teller drawers into a white trash bag. After he had emptied the drawers, Whatley instructed the employees to move to the vault. When the head teller struggled to open the vault, Whatley cocked the gun, put it to her head, and told her that she "better stop F'ing with [him], [she] better open the vault." Another teller opened the vault, and Whatley pulled out a blue canvas gym bag from his pants and loaded it with money from the vault. At some point, he told the employees that he did not want "any funny money with dye packs or anything

9

like that." When Whatley had taken all of the cash, he escorted the employees to the other side of the bank to retrieve the surveillance videotapes and then took the employees back to the vault area. He instructed the employees to get on their knees and not to look at him. He then shut the door of the vault and left. Whatley exited the bank at about 5:15 p.m. with $437,302.

Fourteen months later, on December 13, 2007, Whatley attempted to rob the Bank of America in Dalton, Georgia. He wore jeans, work boots, and a dark sweatshirt. He entered the bank shortly before the 4:00 p.m. closing time and walked up to the second floor where the mortgage loan officers worked. Whatley entered the office of Maria Ortiz, sat down, and announced that he was going to rob the bank. He instructed her to face the wall while he put on rubber gloves and a blue and black bandana. Whatley then drew a black firearm and ordered Ortiz to walk through the offices, restrooms, and conference room on the second floor to verify that no one was there. They encountered another employee, Will Pridgen, and Whatley made Pridgen and Ortiz sit on a couch while they answered his questions about the exits, cameras, and employees. He took Pridgen and Ortiz to the stairs, looked downstairs, and directed them back to Pridgen's office where he asked Pridgen to call downstairs and instruct the employees to come upstairs for a meeting after the bank closed. After closing time, they went back to the stairs, and Whatley told Pridgen and Ortiz to remain on the landing while he checked to see if

10

all of the customers had left. But when Whatley walked down the stairs to look at the first floor, Pridgen ran back upstairs and locked himself in his office. Ortiz hid in a storage area in front of the upstairs door.

On the first floor of the bank, the bank manager, Linda Smith, had unlocked the front doors to allow the last customer to exit when she saw Whatley come down the stairs wearing a dark bandana and a skullcap and carrying a gun. Whatley then entered the elevator to return upstairs and presumably regain control of Pridgen and Ortiz, and Smith instructed the employees to get behind the teller row, lock their cash drawers, and push the alarms. The employees and a customer with two children escaped through the door leading to the drive-through. A customer, Darlene Smithson, who was in the drive-through as the employees escaped, saw a man run out of the back door, get into a black Lexus, and drive off. Smithson decided to follow him, and reported the movements of the vehicle to an operator for 9-1-1. She led the police to the car, and the police took Whatley into custody. The police found white garbage bags stuck in Whatley's back pockets and a blue duffel bag tucked inside his jeans at the lower part of his back. Inside Whatley's vehicle, the police found a pair of latex gloves stuffed in a juice bottle, a white bandana, and a handwritten note that informed the reader that it was a robbery.

11

In June 2008, a federal grand jury indicted Whatley on four counts of armed bank robbery, 18 U.S.C. § 2113(a), (d), and four counts of knowingly using, carrying, or brandishing a firearm in the course of those offenses, id. § 924(c)(1)(A).  Counts one, three, five, and seven were the armed bank robbery charges for the June 24, 2003, April 23, 2004, July 5, 2005, and October 18, 2006, robberies respectively.  Counts two, four, six, and eight were the separate firearms charges for those robberies.  The indictment did not charge Whatley with the attempted bank robbery that occurred on December 13, 2007.  Whatley pleaded guilty to that attempted bank robbery in another proceeding.

At trial, 17 of the bank employee witnesses identified Whatley as the perpetrator of the four bank robberies and the attempted bank robbery.  Three witnesses from the June 24, 2003, robbery described the suspect and identified Whatley in court.  One witness from that robbery testified that she was not sure that she could identify the bank robber.  Four witnesses from the April 23, 2004, robbery identified Whatley in court.  Three witnesses from the July 5, 2005, robbery identified Whatley in court.  The United States did not ask four of the other witnesses from that robbery to identify Whatley in court.  Four witnesses from the October 18, 2006, robbery identified Whatley in court.  Another witness testified that he probably would not recognize the robber.  The United States did not ask another witness from the 2006 robbery to identify the perpetrator because

12

she testified that she did not get a good look at the robber.  Three witnesses from the attempted bank robbery on December 13, 2007, identified Whatley as the perpetrator of that crime.

The United States presented additional circumstantial evidence to support this eyewitness testimony.  The United States introduced thousands of pages of financial records from 2002 to 2007 to establish that Whatley had frequently made large purchases, such as cars, motorcycles, and vacations, in cash or with loans that were satisfied within a few months of the robberies, and that he did not have a legitimate source of income that would have covered those expenditures.  The United States also introduced evidence seized from Whatley's house, including boxes of ammunition, an empty box for a nine millimeter firearm, a blue and white basketball jersey similar to the jersey that the victim employees of the robbery in 2003 had described the robber wearing, multiple pairs of jeans, dark bandanas, a box of latex gloves, and six to seven pairs of black shoes.  And the United States introduced the testimony of an agent for the Federal Bureau of Investigation and a bank security manager that "takeover" bank robberies are "less prevalent" than other forms of armed bank robberies.

On Thursday, March 11, 2010, the jury notified the court that it had reached a verdict as to counts two through eight, but not as to count one.  The district court told the jury to continue to deliberate.  A few hours later, the jury told the district

13

court that it remained deadlocked. The district court then gave the jury an Allen charge. See Allen v. United States, 164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896). Less than an hour after the Allen charge, the jury returned a verdict of guilty on all four counts of armed bank robbery and not guilty on all four counts of firearms offenses.

Later that same day, the deputy clerk of the district court and the prosecutor discovered a document among the exhibits provided to the jury that had not been introduced into evidence. That document was a news article about Whatley's arrest for the attempted robbery. The prosecutor brought it to the attention of the district court, and the court marked the document as Exhibit 1. The court ordered the jurors to return the next day for an evidentiary hearing. At that hearing, several jurors testified that they had discovered another document, marked as Exhibit 4, on the last day of their deliberations. The document was a single page from Whatley's criminal history report that listed a 2002 charge of fleeing or attempting to elude a police officer, a 2003 charge of possession of a firearm by a convicted felon, a 2003 charge of theft by receiving stolen property, and another offense. Nine jurors testified that they had seen Exhibit 4. Seven of those jurors testified that members of the jury had discussed Exhibit 4.

After supplemental briefing on the issue, the district court denied Whatley's motion for a new trial based on the extrinsic evidence. The district court reasoned

14

that Whatley had easily met his burden to establish that the jury was exposed to extrinsic evidence and, as a result, it would presume prejudice. But the district court concluded that the consideration of Exhibit 1 was harmless because the information presented in the news article was cumulative to the evidence produced at trial. The district court also concluded that the consideration of Exhibit 4 was harmless because "there was no intent by any party or juror to taint the jury's deliberations," the jurors did not discover the exhibit until after they had decided on their verdicts for counts two through eight, the jurors remained deadlocked even after they found the exhibit before the Allen charge, and the United States presented a strong case on the sole bank robbery charge under deliberation by the jury when the jurors found the exhibit.

The district court sentenced Whatley to 300 months of imprisonment on counts one, three, and five, to be served concurrently, and 18 months of imprisonment on count seven, to run consecutive to the other counts. Whatley objected to the application of a four-level sentencing enhancement for abduction. See United States Sentencing Guideline § 2B3.1(b)(4)(A). The district court heard argument and overruled the objection because Whatley had herded the employees around different areas of the bank. The district court also ordered Whatley to pay $942,729.50 in restitution to the four banks.

15

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal.  "Constitutional questions are reviewed de novo."  United States v. Douglas, 489 F.3d 1117, 1126 (11th Cir. 2007).  "We review the district court's admission of prior crimes or bad acts . . . for abuse of discretion."  United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir. 2008) (internal quotation marks and alteration omitted).  "We review the denial of a motion for a new trial based on the submission of extrinsic material to the jury for abuse of discretion."  United States v. Dortch, 696 F.3d 1104, 1110 (11th Cir. 2012).  Finally, "[w]e review de novo the application of the sentencing guidelines and findings of fact for clear error."  United States v. Louis, 559 F.3d 1220, 1224 (11th Cir. 2009).

## III. DISCUSSION

We divide our discussion in four parts.  First, we explain why the admission of the in-court identifications did not violate Whatley's right to due process.  Second, we explain why the district court did not abuse its discretion when it admitted the evidence of the attempted bank robbery in 2007.  Third, we explain why the district court did not abuse its discretion when it concluded that the jurors' consideration of extrinsic evidence was harmless.  Fourth, we explain why the district court erred when it applied the sentencing enhancement for abduction to Whatley.

A. *The Admission of the In-Court Identifications Did Not Violate Whatley's Right to Due Process.*

Whatley argues that the admission of the in-court identifications of him by the bank employees violated his right to due process of law. He relies on our precedents in Code v. Montgomery, 725 F.2d 1316 (11th Cir. 1984), and Douglas for the proposition that the admission of in-court identifications may violate a defendant's right to due process if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." Douglas, 489 F.3d at 1126 (internal quotation marks omitted); Code, 725 F.2d at 1319 (internal quotation marks omitted). In those decisions, we first determined whether the in-court identification procedure involved suggestive circumstances and then considered "the totality of the circumstances, including 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation,'" to determine whether the identification was sufficiently reliable to be admitted. Douglas, 489 F.3d at 1126 (quoting Code, 725 F.2d at 1320).

The United States argues that the recent decision of the Supreme Court of the United States in Perry abrogated our precedents about in-court identifications. The defendant in Perry challenged the admission of an out-of-court identification

17

as a violation of his right to due process.  132 S. Ct. at 722.  He argued that the identification was unduly suggestive because it had occurred when a witness, who was being interviewed by police about the break-in of her neighbor's car, looked out her kitchen window and saw the defendant, the only African-American man in the vicinity, standing next to a police officer.  Id. at 721–22.  The witness later was unable to identify the defendant in an array of photographs.  Id.  The Supreme Court concluded that the identification was admissible because "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."  Id. at 730.

Our decisions in Code and Douglas relied upon a reading of case law that the Supreme Court explicitly rejected in Perry.  In Code, we cited Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 (1968), and Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375 (1972), for the propositions that in-court identifications could be inadmissible under the Due Process Clause if they were "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification" and that we must consider the five factors of reliability in making that determination.  Code, 725 F.2d at 1319–20 (internal quotation marks omitted).  Douglas relied upon our prior panel precedent in Code and the decisions of the Supreme Court in Simmons and Biggers for the same rule.  Douglas, 489 F.3d at 1126.  But in Perry

18

the Supreme Court explained that its precedents about the admission of eyewitness identifications during trial had involved circumstances in which "law enforcement officers use[d] an identification procedure that [wa]s both suggestive and unnecessary." Id. at 724. The Supreme Court explained that the first of those decisions, Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967 (1967), involved an undeniably suggestive procedure arranged by police that the Supreme Court had nevertheless upheld because of its necessity. Perry, 132 S. Ct. at 724. The second of those decisions, Simmons, also involved a suggestive identification procedure arranged by police that the court had upheld because of its necessity and reliability. Id.

The Supreme Court explained that it had established in Biggers a two-step analysis to address the requirements of due process for eyewitness identifications when those identifications are obtained under suggestive circumstances arranged by the police:

> Synthesizing previous decisions, we set forth in Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972), and reiterated in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L.Ed.2d 140 (1977), the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. . . . [F]irst, [] due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. . . . [Second,] the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. [R]eliability [of the eyewitness identification] is the linchpin of that evaluation.

19

Perry, 132 S. Ct. at 724–25 (internal quotation marks and citations omitted).

The Supreme Court rejected the argument that its precedents should be read more broadly to require judicial prescreening for reliability "any time an identification is made under suggestive circumstances." See id. at 725. The Supreme Court explained that the primary aim of excluding identification evidence is to "deter law enforcement use of improper lineups, showups, and photo arrays," id. at 726, and that this aim is not served "in cases[] . . . in which the police engaged in no improper conduct," id. And the Supreme Court declined to "open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications":

> [The defendant] maintains that the Court can limit the due process check he proposes to identifications made under "suggestive circumstances." Even if we could rationally distinguish suggestiveness from other factors bearing on the reliability of eyewitness evidence, [the defendant's proposed] limitation would still involve trial courts, routinely, in preliminary examinations. Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do. Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned 'theft suspect,' or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have 'suggested' to the witness that the defendant was the person the witness observed committing the crime.

Id. at 727–28 (emphasis added) (citation omitted).

20

Perry makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police, the requirements of due process are satisfied in the ordinary protections of trial. Id. at 728. These protections include the right to confront witnesses, the right to effective assistance of an attorney who can expose the flaws in identification testimony on cross-examination, the right to eyewitness-specific jury instructions as adopted by the jurisdiction, and the right to be presumed innocent until found guilty beyond a reasonable doubt by a jury of the defendant's peers. Id. at 728–29. Due process imposes no requirement of a preliminary examination for an in-court identification.

We agree with the United States that Perry abrogated our holdings in Code and Douglas. "We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision." Chambers v. Thompson, 150 F.3d 1324, 1326 (11th Cir. 1998). When the Supreme Court made clear in Perry that Simmons, Biggers, and indeed "every case in the Stovall line" relied upon the involvement of law enforcement officials in the creation of the suggestive circumstances of the identification and that the Due Process Clause "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement," Perry, 132 S. Ct. at 725,

21

730, the Court removed the foundation upon which Code and Douglas rested. And when the Supreme Court rejected the argument that the Due Process Clause requires judicial prescreening of all identifications obtained under suggestive circumstances and expressly disapproved the idea that in-court identifications would be subject to prescreening, it made clear that our precedents are no longer good law.

Under Perry, the admission of the in-court identifications of Whatley did not violate his right to due process because he cannot establish that the suggestive circumstances of the identifications were the result of improper police conduct. Whatley argues that the in-court identifications were unnecessarily suggestive because he was seated at the defense counsel table, he was the only African-American man in the courtroom other than courtroom personnel, he had never been identified in a line-up or array of photographs before trial, and he was first seen by the bank employee witnesses during their testimony. But these circumstances were not the result of improper police conduct. Whatley had a constitutional right to be present at his trial, Illinois v. Allen, 397 U.S. 337, 338, 90 S. Ct. 1057, 1058 (1970), and it is customary for the defendant to be seated at the table with his counsel. Whatley did not have a constitutional right to a pre-trial line-up or array of photographs. See Code, 725 F.2d at 1320.

22

Whatley received the same process that the Supreme Court identified in Perry as constitutionally sufficient for defendants who are the subject of identifications not influenced by improper police conduct. Whatley was able to confront all of the eyewitnesses who identified him in court. His counsel ably highlighted the frailties of the in-court identifications, including the discrepancies between the testimony given at trial and the witnesses' previous statements to police, the length of time that had passed between the witnesses' initial statements—when the bank robberies were fresh in their minds—and their testimony at trial, and the past misidentifications by the witnesses of other men as the bank robber. Whatley's counsel also introduced sketches produced by the eyewitnesses that were dissimilar to Whatley to undermine the weight of the eyewitness identifications. The district court provided limiting instructions before each in-court identification and instructed the jury at the end of the trial to evaluate the reliability of each identification. And Whatley was convicted by a jury that found his guilt beyond a reasonable doubt. For these reasons, the admission of the in-court identifications of Whatley by the bank employee witnesses did not violate his right to due process.

*B. The District Court Did Not Abuse Its Discretion When It Admitted the Evidence of the Attempted Bank Robbery in 2007.*

Whatley also argues that the district court abused its discretion when it admitted evidence of the attempted bank robbery he committed in 2007. A district

23

court abuses its discretion, under Federal Rule of Evidence 404(b), when it admits evidence of a previous bad act that does not satisfy the following three criteria: (1) "the evidence must be relevant to an issue other than the defendant's character"; (2) the evidence must be accompanied by "sufficient proof [] that a jury could find that the defendant committed the extrinsic act"; and (3) "the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of [Federal Rule of Evidence] 403." United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010) (internal quotation marks omitted). "Our application of this test . . . varies depending on the issue for which [the evidence is] offered." Id. at 1108 (internal quotation marks and alterations omitted). "When extrinsic offense evidence is introduced to prove identity, 'the likeness of the offenses is the crucial consideration. The physical similarity must be such that it marks the offenses as the handiwork of the accused. In other words, the evidence must demonstrate a modus operandi.'" Id. at 1108 (quoting United States v. Miller, 959 F.2d 1535, 1539 (11th Cir. 1992) (en banc)). "The extrinsic act must be a 'signature' crime, and the defendant must have used a modus operandi that is uniquely his." See id. (internal quotation marks omitted). Whatley argues that the attempted bank robbery did not bear sufficient similarity to the charged crimes to be introduced as evidence of identity.

24

Our precedents are instructive on the level of similarity that must be established between bank robberies to render a previous bank robbery admissible under Rule 404(b).  We reversed the admission of a previous bank robbery committed by the defendant in United States v. Lail, 846 F.2d 1299 (11th Cir. 1988), where the similarities between the charged robberies and the uncharged robbery were that they were both accomplished by a lone gunman who brandished a handgun and wore little or no disguise, id. at 1301.  We explained that these similarities are common to many robberies and that the uncharged robbery had marked differences from the charged robberies.  Id.  The robber in the uncharged robbery, for example, posed as a businessman, used dynamite as his weapon, visited the bank twice on the day he robbed it, and took the bank manager hostage. Id.  The robber in the charged robberies wore a t-shirt and jeans, used a handgun, visited the bank only once, and took no hostages.  Id.  Similarly, in United States v. Myers, 550 F.2d 1036 (5th Cir. 1977), our predecessor circuit determined that an uncharged bank robbery should not have been introduced as evidence, even though "both crimes were bank robberies . . . between two and three o'clock in the afternoon," where the victimized bank was "located on the outskirts of town, [] adjacent to a major highway," included female employees, and the bank robbers "used a revolver, [] furnished their own bag for carrying off the proceeds, and wore [] gloves and [] masks crudely fashioned from nylon stockings,"  Id. at 1046.  The

25

Fifth Circuit explained that these similarities were common to armed bank robberies and that "the combination [] lack[ed] distinction." Id. The court also explained that "[t]he presence of a marked dissimilarity—that the charged crime was perpetrated by a lone gunman, while the uncharged crime was committed by two armed men—further undermine[d] the force of the inference of identity." Id.

In contrast with the robberies in Lail and Myers, the combination of similarities between the charged robberies and the uncharged attempted bank robbery, as well as the lack of dissimilarities between the crimes, marked the crimes as the handwork of Whatley. The charged and uncharged offenses were committed by (1) a lone robber, (2) with a firearm, (3) who dressed casually, (4) carried a dark blue duffel bag, (5) entered the banks shortly before closing, (6) spent an inordinate amount of time in the bank, staying well past closing time, (7) first approached financial services representatives instead of tellers, (8) took the bank employees hostage, and (9) inquired about access to both surveillance tapes and the vault. The United States also presented evidence that true "takeover" style bank robberies are extremely rare, and that the attempted bank robbery was conducted in the "takeover" style even though it was not fully achieved. Although some of these similarities were identified in Lail and Myers as common to many robberies, others are more unusual, including the robber's choice to approach non-teller employees near closing time to notify them first of the robbery, the duration

26

of time that the robber spent in the bank, and the robber's inquiries about surveillance tapes. And, unlike the offenses in Lail and Myers, there are no major dissimilarities between the uncharged and charged offenses.

Our conclusion that the uncharged offense was sufficiently similar to suggest a modus operandi is bolstered by the additional similarities that the uncharged offense shared with the later robberies. In the uncharged attempted bank robbery and the last three bank robberies, for example, the robber initially appeared undisguised, then covered the bottom half of his face with a bandana or kerchief. The last three bank robberies were perpetrated by a robber who wore a pair of latex gloves, and latex gloves were found in Whatley's vehicle after he fled the scene of the attempted bank robbery. Similarly, the robber in the last two robberies used trash bags to collect money after he had filled his duffel bag, and the police found trash bags in Whatley's pockets after the attempted bank robbery. The last two bank robberies involved the use of a handwritten note, and the police found a handwritten note in Whatley's vehicle after the attempted bank robbery. The additional similarities between the last robberies and the attempted bank robbery suggest that Whatley's modus operandi evolved over time.

We reject Whatley's argument. The uncharged crime was sufficiently similar to the charged crimes to prove a modus operandi. The district court did not

27

abuse its discretion when it admitted the evidence of the attempted bank robbery under Rule 404(b).

### C. The District Court Did Not Abuse Its Discretion When It Denied Whatley's Motion for a New Trial.

Whatley next argues that he is entitled to a new trial because the jurors considered the extrinsic evidence in Exhibit 4 during their deliberations. "When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant." Dortch, 696 F.3d at 1110 (quoting United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984)). "A defendant who alleges denial of the right to an impartial jury resulting from juror exposure to extraneous information has the burden of making a colorable showing that the exposure has, in fact, occurred." Id. (alteration omitted) (quoting United States v. Siegelman, 640 F.3d 1159, 1182 (11th Cir. 2011)). "If the defendant does so, prejudice to the defendant is presumed and the burden shifts to the government to show that the jurors' consideration of extrinsic evidence was harmless to the defendant." Id. (internal quotation marks omitted).

We review for an abuse of discretion the determination of the district court that consideration of the extrinsic evidence was harmless, and we consider four factors: "(1) the nature of the extrinsic evidence; (2) the manner in which it reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and[] (4) the strength of the government's

28

case." Id. (quoting Siegelman, 640 F.3d at 1182).  "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004).  Because the "standard allows a range of choice for the district court," "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." In re Rasbury, 24 F.3d 159, 168 (11th Cir. 1994) (internal quotation marks omitted).  "That is how an abuse of discretion standard differs from a de novo standard of review." Id.  Our deferential standard respects that the district court has a better vantage point from which to make this judgment call.

Our decision in Dortch is instructive.  There we concluded that the district court did not abuse its discretion when it determined that juror consideration of an unredacted copy of the defendant's indictment was harmless, even though the unredacted indictment referenced several of the defendant's previously undisclosed felony convictions.  696 F.3d at 1110–11.  The first factor weighed against the conclusion that the extrinsic evidence was harmless because the evidence in question was highly prejudicial.  See id. at 1109.  But the second factor weighed in favor of a conclusion that the exposure was harmless because the jury had received the indictment through the inadvertence of the district court, not through any machinations of the parties.  See id.  And the third and fourth factors weighed

29

heavily in favor of a conclusion that the exposure was harmless because the district court had specifically instructed the jury that the indictment was not evidence of guilt and the government had presented overwhelming evidence of guilt. Id. at 1111. We concluded that the district court did not abuse its discretion when it denied the defendant a new trial.

We agree with the district court that the first factor weighs against a conclusion that the evidence was harmless. Like the extrinsic evidence at issue in Dortch, Exhibit 4 contained prejudicial information about Whatley's criminal history that had not been introduced into evidence. Exhibit 4 reported that Whatley had been charged with fleeing or attempting to elude a police officer in 2002, possession of a firearm by a convicted felon in 2003, and theft by receiving stolen property in 2003. But as in Dortch, the district court determined that the other factors weigh in favor of the conclusion that consideration of this document was harmless.

The district court was entitled to weigh the second factor in favor of the conclusion that the exposure was harmless because Exhibit 4 reached the jury through inadvertence attributable to both the United States and Whatley. The document was inadvertently included in a box with financial records introduced into evidence by the United States because of a "computer 'glitch' that occurred when the documents were scanned electronically, categorized, and numbered."

30

Whatley argues that he should not be held responsible for the evidence reaching the jury because it would have taken many hours to go through the hard copies of the exhibits and he had a right to rely on the representation of the United States that the exhibits were the same documents that it had produced in discovery. But the district court did not clearly err when it found that both parties bore the burden because it had instructed the parties to review the admitted evidence and they had not done so.

The district court also was entitled to weigh the third factor in favor of a conclusion that the exposure was harmless because the district court conducted a thorough examination of the jurors and found that the exhibit did not affect the outcome of their deliberations. When the parties discovered that the jurors may have considered extrinsic evidence during their deliberations, the district court conducted a thorough examination of each juror outside of the presence of the other jurors to determine whether their deliberations had been affected by Exhibit 4. See United States v. Ronda, 455 F.3d 1273, 1300 (11th Cir. 2006) (noting that the district court carefully interviewed each juror individually outside of the presence of other jurors about the issue and found that the extrinsic evidence had not rendered any juror incapable of deciding the case impartially). Based on the testimony given at this hearing, the district court found that the jurors did not find Exhibit 4 until the final hours of their deliberations. The district court considered

conflicting testimony from the jurors about when they discovered the exhibit. And the district court found that the jurors discovered Exhibit 4 after they had first informed the court that they were having trouble reaching a verdict and had been told to continue to deliberate, but before the jurors declared that they were deadlocked and the district court gave them an Allen charge. The district court found that "the jurors remained deadlocked for a period of time even after exposure to the document" and explained that, "even after the [c]ourt gave the Allen charge, the jurors deliberated for almost another hour before reaching a verdict as to [c]ount [o]ne." Whatley does not challenge these factual findings on appeal, and they weigh in favor of a conclusion that the consideration by the jury of the extrinsic evidence was harmless.

Finally, the district court was entitled to weigh the fourth factor in favor of the conclusion that the exposure was harmless because the evidence introduced by the United States on count one was strong. On the sole count on which the jury was still deliberating, the district court reasoned as follows that the United States had presented overwhelming evidence of guilt:

> Three of the four victim bank employees identified Defendant as the person who robbed their bank at gunpoint. Moreover, Defendant utilized the same signature method demonstrated in the 2007 Dalton attempted robbery, which included coming into the bank shortly before closing time without a disguise, waiting until the bank was closed to take or try to take control of the bank, rounding up and herding bank employees around, instructing employees at various times to face the wall, using and brandishing a firearm, threatening

32

employees, asking about video equipment, hiding a blue duffel bag and gun in clothing, and taking his time inside the banks. Moreover, financial records indicated that Defendant spent approximately $15,000.00 in cash money orders within three days of the 2003 bank robbery charged in Count One and that in the final five months of calendar year 2003, Defendant spent over $30,000.00 in cash. Yet, during the entire twelve months of calendar year 2003, Defendant's legitimate, verifiable income amounted to less than $10,000.00. Finally, the evidence presented at trial established that Defendant owned and drove a dark cherry red Chevrolet Impala with nice rims at the time of the 2003 robbery, and police testified that a vehicle with a similar description was seen parked near the bank at the time of the robbery.

And the district court, unlike this Court, had the advantage of hearing the witnesses' testimony in person.

Based on our review of the relevant factors, we cannot conclude that the district court abused its discretion when it determined that the consideration of Exhibit 4 by the jury was harmless. The district court identified and weighed the correct factors and made findings of fact supported by the record. Under our deferential standard of review, the district court made no clear error in judgment.

### D. *The District Court Erred When It Applied the Sentencing Enhancement for Abduction.*

Whatley also argues that the district court erred when it applied a four-level sentencing enhancement for "abduction" of the bank employees. Section 2B3.1 of the Sentencing Guidelines provides that, "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape," the guideline range for the crime of robbery should be "increase[d] by 4 levels." U.S.S.G. § 2B3.1(b)(4)(A).

33

Comment 1 to that section notes that the term "abducted" is defined in the commentary to section 1B1.1. Id. § 2B3.1 cmt. n.1. Comment 1(A) to section 1B1.1 defines "abducted" as follows: "'Abducted' means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." Id. § 1B1.1 cmt. n.1(A). The district court found that Whatley took hostages and herded them inside the banks, but that Whatley never took any of the employees outside the banks.

The United States relies on three decisions in which our sister circuits have applied the enhancement for abduction to defendants who forced employees to move around within a single building. See United States v. Reynos, 680 F.3d 283, 290–91 (3d Cir. 2012); United States v. Johnson, 619 F.3d 469, 474 (5th Cir. 2010); United States v. Osborne, 514 F.3d 377, 389–90 (4th Cir. 2008). The Fourth Circuit in Osborne, for example, applied the abduction enhancement when a defendant forcibly moved pharmacy employees "from the pharmacy section (through its secured door), across the store area (on a winding course through its aisles), to the front door of the Walgreens building." 514 F.3d at 390. The Fifth Circuit in Johnson similarly applied the abduction enhancement when the defendant "jumped over the teller counter to the employee section of the bank and used the teller as a hostage to force the police to retreat from the bank," "forced the

34

victim to accompany him to the front of the bank," and then, when the police were in the front of the bank, forced the victim to her teller station to retrieve a key for the rear door and forced her to accompany him to the rear door to unlock it for him. 619 F.3d at 474. And the Third Circuit in Reynos upheld an abduction enhancement when a defendant broke into a locked bathroom where the employees of a pizza shop were hiding and forced them to walk 34 feet to the cash register. 680 F.3d at 285, 290–91.

But Whatley responds that the Seventh Circuit recently reversed the application of an enhancement for abduction based upon movement of the victims within a building. See United States v. Eubanks, 593 F.3d 645, 654 (7th Cir. 2010). One of the defendants in Eubanks had, during an armed robbery of a beauty supply store, "forced a store employee to the back room of a retail beauty supply store to retrieve a surveillance video," and a different defendant, during an armed robbery of a jewelry store, dragged a store employee about six feet, from the back room of the store to the front room. Id. at 648, 653. The Seventh Circuit explained that to find abduction on the facts present in Eubanks would be to "virtually ensure that any movement of a victim from one room to another within the same building, without any other aggravating circumstances, would result in an abduction enhancement." Id. at 654. But the Seventh Circuit left open the possibility that

35

"there may well be situations in which an abduction enhancement is proper even though the victim remained within a single building." Id.

Although Whatley and the United States argue that these decisions present a clear circuit split on the question whether the enhancement can apply when a defendant moves victims inside a single building, we disagree. None of our sister circuits have adopted a categorical bar to that application. Instead, all of our sister circuits have taken a case-by-case approach to the application of the enhancement.

We too decline to adopt a categorical rule and conclude that Whatley's movement of the bank employees inside each branch bank did not constitute abduction. To be abducted within the meaning of the guidelines, a victim must be "forced to accompany an offender to a different location." U.S.S.G. § 1B1.1 cmt. n.1(A). Although the term "different location" could be interpreted at many different levels of generality, "[t]he language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." United States v. Fulford, 662 F.3d 1174, 1177 (11th Cir. 2011) (internal quotation marks omitted). The ordinary meaning of the term "different location" would not apply to each individual office or room in a local branch of a bank. Instead, the bank would be treated as a single location, as it is in the example provided by the guidelines in which an abduction occurs when an employee is taken from a bank to a getaway car to facilitate the bank robber's escape. Whatley never forced any of

36

the employees to leave the bank, he did not force them to accompany him to a different location, and he cannot be said to have abducted them.

This interpretation is consistent with the ordinary understanding of the word "abducted." The Oxford English Dictionary defines "abducted" as "led or carried away improperly, kidnapped." 1 Oxford English Dictionary 14 (1961). And Black's Law Dictionary defines abduction as "[t]he act of leading someone away by force or fraudulent persuasion" and notes that it is loosely defined as kidnapping. Black's Law Dictionary 4 (9th ed. 2009). An ordinary observer would conclude that Whatley had taken the bank employees hostage during the commission of the bank robberies, but would not describe those employees as having been abducted or kidnapped.

This interpretation also preserves a distinction between the sentencing enhancement for physical restraint and the sentencing enhancement for abduction. Section 2B3.1 of the Sentencing Guidelines applies a sentencing enhancement of two levels "if any person was physically restrained to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.1(b)(4)(B). Like "abducted," the phrase "physically restrained" is defined in the commentary to § 1B1.1. Id. § 2B3.1 cmt. n.1. Comment 1(K) defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." Id. § 1B1.1 cmt. n.1(K). We have interpreted the words "such as" to indicate that "the

illustrations of physical restraint are listed by way of example rather than limitation." United States v. Jones, 32 F.3d 1512, 1518 (11th Cir. 1994) (internal quotation marks omitted).  As we explained in Jones, "a defendant physically restrains his victims if he creates circumstances allowing the persons no alternative but compliance." Id. at 1519 (internal quotation marks omitted).  Based on this interpretation, we applied a two-level sentencing enhancement for physical restraint in Jones when the employees and customers of a credit union "were forced at gunpoint into the safe room and ordered to lie face down on the floor." Id.  To interpret the abduction enhancement to apply to this conduct would blur the distinction between physical restraint and abduction.  For these reasons, the district court should have applied only the enhancement for physical restraint, not the enhancement for abduction.

## IV.  CONCLUSION

We **AFFIRM** Whatley's conviction, **VACATE** Whatley's sentence, and **REMAND** for resentencing with instructions to apply the two-level enhancement for physical restraint instead of the four-level enhancement for abduction.

JORDAN, Circuit Judge, concurring in part and dissenting in part:

With two exceptions, I agree with and join the majority opinion. First, I would not use this case as a vehicle to address whether *Perry v. New Hampshire,* 132 S.Ct. 716 (2012), abrogates our circuit precedent concerning purely in-court identifications. Because Mr. Whatley's arguments fail even under our pre-*Perry* cases, there is no need to decide the effect of *Perry* in this appeal. Second, I believe that Mr. Whatley is entitled to a new trial on Count 1 given the jury's improper exposure to, and consideration of, his prior criminal history. The evidence on Count 1 was not overwhelming, and as a result, the government cannot overcome the presumption of prejudice triggered by the exposure.

1. Procrastination is not generally seen as a good character trait, but in constitutional adjudication it can often be a virtue.[1] In my opinion, we need not and should not decide the effect of *Perry* here because Mr. Whatley cannot prevail on his due process claim even under our pre-*Perry* precedent.

The district court, at the defense's request, held a hearing on whether the bank employees should be allowed to identify Mr. Whatley as the perpetrator of the several robberies charged in the indictment. Mr. Whatley does not think the

---

[1]"Decisional minimalism" – that is, "saying no more than necessary to justify an outcome, and leaving as much as possible undecided" – "has two attractive features. First, it is likely to reduce the burdens of judicial decision. . . . Second, and more fundamentally, minimalism is likely to make judicial errors less frequent and (above all) less damaging." CASS R. SUNSTEIN, ONE CASE AT A TIME: JUDICIAL MINIMALISM ON THE SUPREME COURT 3-4 (1999).

39

district court did enough, and essentially urges us to impose a requirement that the police present a witness, before trial, with a photographic array to see if she can identify the defendant. Our pre-*Perry* cases, however, decline to mandate any such procedure. *See, e.g., Code v. Montgomery,* 725 F.2d 1316, 1320 (11th Cir. 1984) ("failure to hold a pretrial lineup does not violate due process").

Mr. Whatley also contends that due process prohibits a witness from identifying a defendant in court after a certain period of time has elapsed, at least in circumstances where the defendant looks different than anyone else in the courtroom at the time of the identification. Otherwise, he says, the in-court identification is unduly suggestive (and therefore unconstitutional). But our pre-*Perry* cases foreclose that argument as well. *See, e.g., United States v. Munroe,* 421 F.2d 644, 645 (5th Cir. 1970) (prosecution of elderly defendant for forging endorsements on, and "uttering," bonds: "One novel assignment of error is based on the theory that appellant was entitled to a line-up out of the presence of the jury prior to the bank employee being asked to identify him. This theory rested on the idea that appellant was seventy years of age, white-haired and thus easily identifiable. The court did not err in refusing this request. The identification in question was an in-court or in-trial identification. . . . The lapse of time between negotiation [of the bonds] and trial and the distinctive appearance of appellant were matters of weight for the jury; these circumstances did not dictate non-

40

admissibility or an out of presence of the jury lineup consisting of other seventy year old white-haired men."). *See also United States v. King,* 461 F.2d 152, 155 (D.C. Cir. 1972) ("Timing, a matter which normally goes to the weight of the evidence and credibility of the witness, not the admissibility of an identification, is within the jury's province.").

Because Whatley's arguments fail under our current precedent, it seems to me that this is not the case to decide how broadly *Perry* sweeps.   But the majority thinks otherwise, and holds that under *Perry* there are no constitutional problems with in-court identifications that are not tainted by suggestive police procedures, even when those identifications are made years after the events in question.  Given this holding, it is critical that district courts carefully consider any appropriate requests to allow relevant expert testimony on the possible shortcomings of eyewitness identifications.  *See, e.g., Perry,* 132 S.Ct. at 729 ("In appropriate cases, some States also permit defendants to present expert testimony on the hazards of eyewitness identification evidence."); *United States v. Smith,* 621 F. Supp. 2d 1207, 1209-21 (M.D. Ala. 2009) (allowing general expert testimony in bank robbery case on eyewitness identifications, specifically the reliability of cross-racial identifications, identifications made under stress, and the effect of post-event information on identifications).  I recognize that some of our cases, like *United States v. Thevis,* 665 F.2d 616, 641-42 (5th Cir. Unit B. 1982), and *United*

*States v. Smith,* 122 F.3d 1355, 1357-59 (11th Cir. 1997), appear to hold that the exclusion of such expert testimony can never be -- regardless of the circumstances -- an abuse of discretion. But if that is what those cases say, they are, in my view, wrongly decided and should be reconsidered by the court en banc. The abuse of discretion standard, though deferential, should not operate as a one-way evidentiary ratchet to insulate exclusions of this type of expert testimony from meaningful appellate review.

2. Prior to trial, the district court ruled pursuant to Rule 403 that the government could not introduce Mr.Whatley's prior convictions because they would be unfairly prejudicial. The jury, however, learned about Mr. Whatley's prior criminal history at a time when it was deadlocked on Count 1. This exposure triggered a presumption of prejudice, and the government, in my view, did not overcome that presumption because its evidence on Count 1 was not overwhelming.

"[E]xposure to extraneous material or influence requires a new trial if the exposure poses a reasonable possibility of prejudice." *United States v. Khanani,* 502 F.3d 1281, 1291 (11th Cir. 2007) (internal quotation marks omitted). And where, as here, it is undisputed that there was such exposure, "prejudice is presumed and the burden shifts to the government to rebut the presumption." *United States v. Tobin,* 676 F.3d 1264, 1296 (11th Cir. 2012). To successfully

rebut the presumption, the "government must show that the extrinsic material or influence was 'harmless to the defendant.'"  *Id.* (citation omitted).    This is a burden which we have characterized as "heavy." *See United States v. Martinez,* 14 F.3d 543, 550 (11th Cir. 1994).

In analyzing whether the government has carried its burden and rebutted the presumption of prejudice, we examine the totality of the circumstances and consider a number of factors, including the nature of the extrinsic material, the manner in which the information reached the jury, the district court's factual findings and manner of inquiry, and the strength of the government's case. *Tobin,* 676 F.3d at 1296-97.    But these factors do not constitute a mandatory checklist with pre-established numerical weights, and at times we have not considered all four. *See, e.g., McNair v. Campbell,* 416 F.3d 1291, 1308 (11th Cir. 2005) (examining only three of the factors).  As we are trying to assess harm, the most important of these factors, it seems to me, are usually the nature of the extrinsic material and the strength of the government's case.

The nature of the extrinsic material cannot possibly help the government rebut the presumption of prejudice. The jury improperly learned during its deliberations that Mr. Whatley, about four months before the June 2003 bank robbery charged in Count 1, had been charged with possession of a firearm by a convicted felon (thereby indicating, at the very least, that Mr. Whatley was a

convicted felon suspected of carrying a gun) and with theft by receipt of stolen property (thereby indicating that Mr. Whatley was suspected of being a thief). The district court correctly concluded that Mr. Whatley's convictions for those charges were unfairly prejudicial, and excluded them from trial pursuant to Rule 403. It is easy to see why the district court applied Rule 403 the way it did: Knowing that Mr. Whatley was a convicted felon who was suspected of possessing a gun and being involved with stolen property, the jury could have easily concluded that a foray into armed bank robbery was not out of the question. *Cf. United States v. Howard,* 506 F.2d 865, 867 (5th Cir. 1975) ("We cannot doubt the prejudicial potential of a report . . . that [the defendant] had been in trouble before.").

Nor does the evidence on Count 1 allow the government to discharge its burden. It is true, as the majority writes, that three bank employees identified Mr. Whatley as the perpetrator of the June 2003 robbery at trial. But these in-court identifications cannot be considered in a vacuum. To begin with, the identifications were made in 2010, seven years after the bank robbery in question, and it does not take a Nobel laureate in medicine to understand that "[t]ime's the thief of memory." STEPHEN KING, THE GUNSLINGER 161 (Signet rev. & exp. ed. 2003). More significantly, however, these three bank employees -- just days after the robbery -- confidently identified a different African-American man as the

44

perpetrator.[2] The in-court identifications may have been sufficient for Count 1 to withstand a Rule 29 motion, but they were not, in any sense of the word, "overwhelming." *Compare Martinez,* 14 F.3d at 552 ("Because the government's evidence was not overwhelming, we conclude that a reasonable probability exists that extrinsic matters influenced the jury's deliberations, and that the district court abused its discretion when it denied Martinez's motion for a mistrial."), *with McNair,* 416 F.3d at 1309 (holding that presumption of prejudice was rebutted in part because "the state offered overwhelming and largely uncontested evidence of . . . guilt"), and *United States v. Bollinger,* 837 F.2d 436, 440 (11th Cir. 1988) ("The district court denied de la Fuente's two motions for a new trial on the ground that the evidence against de la Fuente was so overwhelming that the introduction of extrinsic evidence could not have been prejudicial. We agree.").

The government's evidence that Mr. Whatley cashed $15,000 in money orders shortly after the June 2003 bank robbery and spent roughly $30,000 in cash during the final months of 2003 also does not rebut the presumption of prejudice. These amounts were a little more than half of the nearly $82,000 stolen in the robbery, and the district court noted that Mr. Whatley may have earned about

---

[2] According to Detective Johnson's trial testimony, Ms. Eidson told an investigator that this other man "was the person," while Ms. Buddle and Ms. Bell said they were 90% and 80% sure, respectively, that this other man robbed the bank. *See* D.E. 130 at 431-32. The district court did not address these misidentifications in its order denying Mr. Whatley a new trial, and the majority does not mention them in its opinion.

45

$10,000 in 2003 in "legitimate, verifiable income," meaning that Mr. Whatley spent about $35,000 that was unaccounted for. That sum is certainly suspicious, but is not the sort of definitive evidence that overcomes a presumption of prejudice.

The same goes for the government's "modus operandi" evidence. The so-called "signature method" used in the 2003 bank robbery -- e.g., coming into the bank shortly before closing without a disguise, waiting until the bank was closed before trying to take control of the premises, rounding up the bank employees, instructing the employees at various times to face the wall, asking about video equipment, brandishing and using a firearm -- does not seem so distinctive so as to rebut the presumption of prejudice, with or without the eyewitness and expenditure evidence summarized above. Indeed, some of the listed similarities (using a gun, telling employees to face the wall, asking about video equipment) are "common to many bank robberies." *United States v. Lail,* 846 F.2d 1299, 1301 (11th Cir. 1988).

Maybe the best indicator of the relative weakness of the government's evidence as to the June 2003 robbery is the fact that the jury was deadlocked on Count 1 at the time it learned of Mr. Whatley's prior criminal history. Given the district court's finding that nine of the twelve jurors were exposed to Mr.

46

Whatley's criminal history information, I cannot see how the government rebutted the presumption of prejudice.

I recognize that the district court's denial of a new trial on Count 1 is reviewed for abuse of discretion, and that such a standard is deferential. And, having been on the district court for over a decade, and on the circuit court for a little over a year, I hope that I have not forgotten the latitude afforded by that standard. Nevertheless, my review of the record leads me to conclude that the government did not rebut the presumption of prejudice triggered by the jury's exposure to Mr. Whatley's prior criminal history. I would therefore grant Mr. Whatley a new trial on Count 1.