******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA, J., joins, concurring in the judgment. Distilled to its essence, the question the court must answer in the present case is whether first time in-court identifications violate the rights guaranteed to criminal defendants under the due process clauses of the fifth and fourteenth amendments to the United States constitution. In addressing this question, I am mindful of the fact that the constitution *does not* require the "best practice" or a perfect trial. *United States* v. *Kahn*, 415 U.S. 143, 155 n.15, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974) (in fourth amendment context, police officers need not follow best practice in order for search to pass constitutional muster); *Bruton* v. *United States*, 391 U.S. 123, 135, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) ("[a] defendant is entitled to a fair trial but not a perfect one" [internal quotation marks omitted]); see also *State* v. *Marquez*, 291 Conn. 122, 145, 697 A.2d 56 (test for determining whether identification procedure is unnecessarily suggestive "is not a best practices test" [emphasis omitted; internal quotation marks omitted]), cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Thus, my objective is not to determine which of the many alternative identification procedures is the "best" or is likely to result in the most reliable identification. Instead, I must consider only whether first time in-court identifications are constitutionally permissible.

In the present case, the majority crafts what it describes as a "prophylactic constitutional [rule]" requiring the prescreening of first time in-court identifications.[1] Footnote 11 of the majority opinion. The majority's rule prohibits a first time in-court identification that is not preceded by a nonsuggestive out-of-court identification in which the eyewitness identified the defendant, unless the defendant's identity or the witness' ability to identify the defendant is not at issue in the case.[2] It may well be that such prescreening would be a better practice than a first time in-court identification. Indeed, I encourage law enforcement personnel to secure an out-of-court identification, through a procedure consistent with General Statutes § 54-1p, at the earliest reasonable time following the commission of a crime. My concern in the present case, however, is not what the ideal identification procedure is but whether first time in-court identifications pass constitutional scrutiny. After a review of the relevant federal authority, I conclude that they do, as long as the defendant is afforded the traditional protections of our adversary system, such as confrontation, the attendant right to cross-examine state witnesses, closing argument, jury instructions, the presumption of innocence, and the government's burden to prove guilt beyond a reasonable doubt. See *Perry* v. *New Hamp-*

*shire*, U.S. , 132 S. Ct. 716, 728–29, 181 L. Ed. 2d 694 (2012) (discussing "safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability"). For this reason, I do not join the majority opinion.[3] Because the majority ultimately concludes that the admission of the in-court identification in the present case was harmless beyond a reasonable doubt and affirms the judgment of conviction, I concur in the judgment.

The defendant in the present case, Andrew Dickson, claims that the trial court violated his due process rights, under the fifth and fourteenth amendments to the United States constitution, by allowing an eyewitness, Albert Weibel, to make an inherently suggestive first time in-court identification. He further argues that the trial court abused its discretion by not excluding the identification or by not permitting a less suggestive in-court identification procedure. In addition, the defendant claims that the Appellate Court incorrectly concluded that the trial court's actions were permitted by *State* v. *Smith*, 200 Conn. 465, 512 A.2d 189 (1986). In the alternative, the defendant argues that *Smith* should be overruled because it is outdated and inconsistent with the evolving social science literature regarding eyewitness identifications.[4]

I

I will first address the defendant's claim that the Appellate Court improperly applied *Smith* to the present case. In *Smith*, the victim of a robbery and sexual assault was presented with an array of six photographs, from which she identified the defendant, Patrick D. Smith, as the perpetrator. Id., 467. The victim was less than certain, however, about her identification. See id. At trial, the victim again identified Smith as the perpetrator after, at the state's attorney's request, Smith stood, approached the witness, and spoke. See id., 468. On appeal, Smith did not challenge the photographic array but, instead, argued that the in-court identification procedure, namely, the requirement that he approach the victim and speak, was unnecessarily suggestive. Id. Smith conceded, however, that in-court identifications were not per se unduly suggestive. Id. This court rejected Smith's argument, reasoning that all trials convey the message that the state believes the person charged committed the crime, and that factor is what creates suggestion. Id., 468–69. We did not agree that the additional steps ordered in *Smith*—that Smith approach the victim and speak—made the in-court identification anymore suggestive than usual. See id., 468. We also noted that the constitution requires suppression of in-court identifications only when they are tainted by unnecessarily suggestive out-of-court identification procedures and, even then, only under certain circumstances, and that there is no constitutional right

to have an in-court identification conducted by lineup or some other less suggestive means. Id., 469–70. Finally, we concluded that "[t]he manner in which in-court identifications are conducted *is not* of constitutional magnitude but rests within the sound discretion of the trial court." (Emphasis added.) Id., 470.

Smith also argued, as the defendant does in the present case, that the trial court had abused its discretion by not granting his request for a less suggestive in-court identification procedure. Id., 471. This court rejected that claim as well because it had not been preserved. Id., 471–72. Despite having determined that Smith's claim was unpreserved, this court stated that the constitution does not require trial courts to allow alternative identification procedures and that the decision regarding requests for such procedures lies within the trial court's discretion. Id.

In the present case, the defendant contends that *Smith* does not control because the claim regarding an alternative in-court identification procedure in that case was unpreserved. In the present case, however, the defendant correctly asserts that such a claim has been preserved. The defendant maintains that, instead of *Smith*, the "persuasive authority" of *United States* v. *Archibald*, 734 F.2d 938, 940–43 (2d Cir.), modified on other grounds, 756 F.2d 223 (2d Cir. 1984), should have controlled the Appellate Court's decision and should guide this court's decision. I do not agree.

First, although Smith's claim for an alternative in-court identification procedure was not preserved, we did state that granting or denying such a request was within the sound discretion of the trial court. *State* v. *Smith*, supra, 200 Conn. 472. We further noted that defendants do not possess a constitutional right to less suggestive in-court identification procedures, such as an in-court lineup. Id., 471. Second, although the facts of *Smith* and the present case are distinguishable, the governing principles employed in addressing Smith's first claim—that the in-court identification was unnecessarily suggestive—are equally applicable in the present case. As this court noted in *Smith*, in-court identifications must be excluded when they are tainted by unnecessarily suggestive out-of-court identification procedures that are conducive to irreparable misidentification. See id., 469. That remains the law today. See, e.g., *Perry* v. *New Hampshire*, supra, 132 S. Ct. 730 ("the [d]ue [p]rocess [c]lause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement"). Finally, and relatedly, notwithstanding the nearly thirty years that have passed since our decision in *Smith*, it remains an accurate statement of federal constitutional law regarding in-court identifications. For example, our statement in *Smith* that the

United States Supreme Court has not extended the exclusionary rule to in-court identifications that are suggestive merely due to the trial setting is still accurate today. See, e.g., *United States* v. *Correa-Osorio*, 784 F.3d 11, 19–20 (1st Cir.) (observing split in United States Circuit Courts of Appeals regarding standard for evaluating purportedly suggestive in-court identifications), cert. denied sub nom. *Shepard-Fraser* v. *United States*, U.S. , 135 S. Ct. 2909, 192 L. Ed. 2d 940 (2015), and cert. denied, U.S. , 136 S. Ct. 336, 193 L. Ed. 2d 242 (2015).

## II

Having determined that the in-court identification in the present case was properly admitted under *Smith*, I turn to the defendant's second claim, namely, that the time has come to overrule *Smith*. The defendant argues that the "time is ripe" to overrule *Smith* in light of the burgeoning social science literature and research regarding the reliability of eyewitness identifications. Moreover, he asserts that this court already has recognized social science's evolved understanding of eyewitness identifications in cases such as *State* v. *Ledbetter*, 275 Conn. 534, 579, 881 A.2d 290 (2005) (requiring, in light of scientific research, that jury instruction be given in cases when [1] "the state has offered eyewitness identification evidence," [2] "that evidence resulted from an identification procedure," and [3] "the administrator of that procedure failed to instruct the witness that the perpetrator may or may not be present in the procedure"), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), and *State* v. *Guilbert*, 306 Conn. 218, 246–48, 49 A.3d 705 (2012) (allowing introduction of expert testimony regarding reliability of eyewitness identifications and factors that affect reliability of identifications). In-court identifications are inherently suggestive, the defendant avers, and their reliability should be assessed under the current scientific understanding.[5] For the reasons that follow, I do not agree that *Smith* should be overruled or that a prophylactic rule for prescreening first time in-court identifications should be adopted.[6]

I begin by voicing my concern over this court's authority to craft the prophylactic rule that it adopts in the present case. Specifically, I question this court's authority to adopt prophylactic rules under the United States constitution. The majority has not cited a case, statute, or constitutional provision that bestows on *this court*—a state court established by a state constitution—the power it today has opted to exercise. Citing cases in which the United States Supreme Court—a federal court established by article III, § 1, of the United States constitution—has exercised its authority to create prophylactic rules is no answer. It seems to me that the power to craft prophylactic rules under the federal constitution rests solely with the United States Con-

gress; see, e.g., U.S. Const. amend. XIV, § 5 ("[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article")[7]; *Boerne* v. *Flores*, 521 U.S. 507, 518, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997) ("[l]egislation [that] deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power [under § 5 of the fourteenth amendment] even if in the process it prohibits conduct [that] is not itself unconstitutional"); or with the United States Supreme Court or other federal courts.[8] See *Ohio* v. *Robinette*, 519 U.S. 33, 43, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (Ginsburg, J., concurring in the judgment) (suggesting that United States Supreme Court may craft prophylactic measures to safeguard federal constitutional rights but that state high courts are permitted to craft such rules only under state constitutions). The majority obfuscates the issue by contending that my reliance on Justice Ruth Bader Ginsburg's concurrence in *Robinette* is mistaken because, according to the majority, Justice Ginsburg was not suggesting that state courts do not have authority to adopt prophylactic rules under the federal constitution.[9] See footnote 11 of the majority opinion. Regardless of the true meaning of Justice Ginsburg's concurrence, it is the majority's obligation to identify the source of the authority it exercises in the present case by referring to some primary source of law, such as a constitutional provision or statute. This is a task that the majority is unable to accomplish, likely because no such source of authority exists.[10] In any event, it is particularly true in the present case that this court lacks the authority to adopt the prophylactic rule that the majority announces because the controlling jurisprudence of the United States Supreme Court does not support it, as I explain subsequently in this opinion.

Even if this court could craft the rule that the majority adopts, it nevertheless is an improper application of federal law. The determination of this question is aided by a review of the development of federal jurisprudence on eyewitness identifications.[11] The United States Supreme Court's modern jurisprudence on eyewitness identifications begins with a trio of cases decided in 1967, namely, *United States* v. *Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *Gilbert* v. *California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967), and *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). In *Wade* and *Gilbert*, the court considered the admissibility of in-court identifications that were preceded by out-of-court lineup identifications conducted without giving notice to and in the absence of the defendants' attorneys. *United States* v. *Wade*, supra, 219–20; see also *Gilbert* v. *California*, supra, 264. In *Gilbert*, the court also considered the admissibility of the testimony of some witnesses that they had identified the defendant at the out-of-court lineup. *Gilbert* v. *California*, supra, 264–65. In

light of the "dangers and variable factors" peculiar to identification procedures, including the potential for prejudicial suggestiveness, and the general "vagaries of eyewitness identification[s]"; *United States* v. *Wade*, supra, 228; the court concluded that an accused is entitled to have counsel present during postindictment identifications arranged for the purpose of eliciting identification evidence for trial. Id., 236–37; see also *Gilbert* v. *California*, supra, 272. Of particular concern is the difficulty of uncovering and reconstructing for the jury what occurred during an uncounseled identification procedure, thereby inhibiting the ability of the defendants to effectively attack the credibility of the eyewitnesses. *United States* v. *Wade*, supra, 230–32. Nevertheless, the court concluded that the violations of the defendants' right to counsel during the out-of-court identification procedures did not, per se, require the exclusion of the subsequent in-court identifications. Id., 240 ("[when] . . . the admissibility of evidence of the lineup identification itself is not involved, a per se rule of exclusion of courtroom identification would be unjustified"); see also *Gilbert* v. *California*, supra, 272 (admissibility of in-court identifications depended on determination of whether identifications had independent source or were tainted by illegal lineup). Instead, in deciding whether an in-court identification should be allowed, a court must determine whether such an identification is based on the witness' observation of the defendant at the improper pretrial identification or on the witness' independent observation of the defendant, such as during the commission of the crime. *United States* v. *Wade*, supra, 240–41; see *Gilbert* v. *California*, supra, 272. The admissibility of the testimony of certain witnesses regarding their out-of-court lineup identifications, the court stated, raised an entirely different question. See *Gilbert* v. *California*, supra, 272–73. The court in *Gilbert* applied a per se exclusionary rule to such testimony, reasoning that the testimony was the direct result of an illegal lineup, and a per se rule of exclusion would be the only effective way to deter law enforcement personnel from engaging in similar practices in the future. Id.

*Stovall* raised a different issue for the court to address. In that case, the court considered whether an out-of-court identification was so suggestive and "conducive to irreparable mistaken identification" that it violated the defendant's due process rights. *Stovall* v. *Denno*, supra, 388 U.S. 301–302. In the showup identification at issue, the petitioner was presented to the eyewitness in her hospital room. Id., 295. At the time, the petitioner was handcuffed to one of five police officers who, along with two members of the District Attorney's Office, accompanied him into the eyewitness' hospital room. Id. The petitioner was also the only African-American individual in the room and was required to repeat a few words. Id. The witness identi-

fied the petitioner after an officer asked if he "was the man . . . ." (Internal quotation marks omitted.) Id. Whether an identification is so unnecessarily suggestive as to violate a defendant's due process rights, the court stated, depends on the totality of the circumstances surrounding it. Id., 302. The eyewitness was the only person who could identify the petitioner as the assailant, or exonerate him, and it was unclear whether the eyewitness would live. Id. Thus, the court concluded that, under those circumstances, the identification did not violate the petitioner's due process rights. Id.

Between 1967 and 1972, the court heard three additional cases in which it was alleged that law enforcement had conducted unnecessarily suggestive pretrial identification procedures that gave "rise to a very substantial likelihood of irreparable misidentification"; (internal quotation marks omitted) *Coleman* v. *Alabama*, 399 U.S. 1, 5, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970) and, therefore, that the introduction into evidence of the out-of-court, or subsequent in-court, identifications violated the defendants' due process rights. See id., 3; *Foster* v. *California*, 394 U.S. 440, 441–42, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969); *Simmons* v. *United States*, 390 U.S. 377, 381–82, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). In each case, the court stated that the determination of whether an identification process violates an accused's due process rights depends on the totality of the circumstances. *Coleman* v. *Alabama*, supra, 4; *Foster* v. *California*, supra, 442; *Simmons* v. *United States*, supra, 383. The court further noted that the reliability of identification evidence is generally a matter for the jury to determine, and, thus, it would be excluded only after a showing that the identification procedure in question was so unnecessarily suggestive as to taint the identification.[12] See *Foster* v. *California*, supra, 443 n.2 ("in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law"); *Simmons* v. *United States*, supra, 384 ("convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground *only* if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" [emphasis added]).

Then, in *Neil* v. *Biggers*, 409 U.S. 188, 195, 198–99, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), the court addressed whether an unnecessarily suggestive identification procedure—in that case, a showup—in and of itself required the exclusion of identification evidence, such as testimony regarding the out-of-court identification. The court answered the question in the negative, reasoning that its earlier cases made clear that it is not the unnecessarily suggestive procedure that violates the defendant's due process rights but *the likelihood of misidentification* that might result from such proce-

dure.[13] See id., 198–201. When a defendant challenges the admissibility of identification evidence, the court stated, *the central question is whether the identification is reliable, despite a suggestive procedure.* Id., 199. The court provided five factors for courts to consider in evaluating the reliability of an identification, which have come to be known as the *Biggers* factors: (1) "the opportunity of the witness to view the criminal at the time of the crime"; id.; (2) "the witness' degree of attention"; id.; (3) "the accuracy of the witness' prior description of the criminal"; id.; (4) "the level of certainty demonstrated by the witness at the confrontation"; id.; and (5) "the length of time between the crime and the confrontation." Id., 199–200.

In 1977, the United States Supreme Court had its first opportunity to address the admissibility of out-of-court identification evidence that resulted from an unnecessarily suggestive identification procedure post-*Stovall*, in *Manson* v. *Brathwaite*, 432 U.S. 98, 109, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The question in *Brathwaite* was whether a per se exclusionary rule or the rule announced in *Biggers* should apply to such evidence. Id., 99, 107. Rejecting the per se exclusionary rule and concluding that the *Biggers* test should apply to both pre-*Stovall* and post-*Stovall* identifications, the court considered three interests. Id., 111–13. First, the court noted that the concern underlying *Wade* and its companion cases was ensuring that identification evidence presented to the jury has aspects of reliability. See id., 111–12. Although both the per se exclusionary rule and the *Biggers* test help to keep unreliable evidence from the jury, "[t]he per se rule . . . goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant." Id., 112. The court next considered the alternative rule's deterrent effect on law enforcement. Id. The per se rule, the court conceded, would have a greater deterrent effect. Id. Nevertheless, the *Biggers* approach also influences law enforcement behavior because, to guard against the possible exclusion of evidence, officers need to avoid suggestive procedures. Id. Finally, the court considered the administration of justice. Id. Under this consideration, the court noted that the per se approach has a serious drawback, namely, that it deprives the trier of fact of reliable evidence, which, in turn, may result in the "guilty going free." Id. Moreover, the court noted that it would be "Draconian" to reverse a conviction when a trial court's admission of evidence would constitute error under the per se approach but be proper under the totality approach adopted in *Biggers*. Id., 112–13. "[R]eliability is the linchpin in determining the admissibility of identification testimony," the court concluded; id., 114; after all, it is not the suggestive identification procedure that is violative of due process. Id., 113 n.13. The *Biggers* totality of the circumstances

approach properly balances these interests and limits the societal cost of excluding relevant and reliable evidence of guilt in criminal proceedings. See id., 110.

The court most recently addressed the issue of eyewitness identifications in *Perry* v. *New Hampshire*, supra, 132 S. Ct. 716.[14] In *Perry*, the eyewitness, Nubia Blandon, spontaneously identified the petitioner, Barion Perry, from the window of her fourth floor apartment, while Perry was standing next to a police officer and was the only African-American in the area. Id., 721–22. Thus, the court had to address whether identification evidence had to be prescreened for reliability when it resulted from a suggestive procedure that was *not* arranged by law enforcement. Id., 723. The court concluded that, unless identification evidence is tainted by "improper state conduct"; id., 728; due process does not require such evidence to be prescreened for reliability; id., 725; and the court rejected Perry's contention that the *Biggers* test should apply to Blandon's identification of him. See id., 725–28. The purpose of excluding identification evidence obtained through a suggestive procedure falls away when the suggestive procedure was not orchestrated by law enforcement. See id., 726. A primary aim of the rule adopted in *Brathwaite*, the court observed, was to deter officers from using improper identification procedures. Id. When the police do not arrange the identification, however, the deterrence concern is not present. Id.

Moreover, the court noted in *Perry* that the constitution's safeguard against convictions based on unreliable or questionable evidence is not the exclusion of such evidence but an opportunity for the defense to persuade the jury that such evidence is untrustworthy. Id., 723. In fact, a determination regarding the reliability of evidence, the court observed, is normally within the province of the jury, and due process requires the exclusion of evidence only when it "is *so extremely unfair* that its admission violates fundamental conceptions of justice . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 723; see also *Kansas* v. *Ventris*, 556 U.S. 586, 594 and n.*, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009) (allowing testimony of jailhouse informant for purpose of impeaching respondent's testimony with prior inconsistent statement and rejecting "a broader exclusionary rule for uncorroborated statements obtained [by jailhouse snitches]," despite inherent unreliability, because "[o]ur legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses"); *Dowling* v. *United States*, 493 U.S. 342, 353, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (rejecting claim that testimony regarding prior misconduct, of which defendant was acquitted, should be excluded because it is inherently unreliable, reasoning that jury "remained free to assess the truthfulness and the significance" of such testimony); *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct.

1173, 3 L. Ed. 2d 1217 (1959) (restating established law that due process prohibits prosecution from obtaining conviction through false evidence or sustaining conviction on evidence that, although not solicited by prosecution, it knows to be false and leaves uncorrected, and extending such due process protection to evidence regarding witness' credibility). In light of its recognition that, traditionally, the jury, not judges, determine the reliability of evidence, the court in *Perry* concluded that our adversary system already provided defendants like Perry with adequate protections against potentially unreliable identification testimony. *Perry* v. *New Hampshire*, supra, 132 S. Ct. 728. Those protections, many of which are guaranteed by the constitution, include the rights of confrontation and to the effective assistance of counsel, jury instructions, the presumption of innocence and the government's burden to establish guilt beyond a reasonable doubt, evidentiary rules requiring exclusion of unduly prejudicial evidence, and expert testimony regarding the shortcomings of eyewitness identifications. Id., 728–29.

### III

With this background in mind, I turn to the defendant's claim in the present case. As I previously stated, the defendant contends that, in light of developments in social science regarding eyewitness testimony and the inherent suggestiveness of in-court identifications, *Smith* should be overruled. The defendant argues that first time in-court identifications either should be prescreened for reliability or excluded entirely, except for good reason. The majority agrees with the defendant. After concluding that in-court identifications are suggestive, the majority holds that first time in-court identifications must be prescreened. The screening procedure that the majority adopts, however, is largely unlike any of the procedures advocated by the defendant.[15] See footnote 5 of this opinion. First time in-court identifications are inadmissible, pursuant to the majority's approach, unless they are preceded by nonsuggestive out-of-court identifications, with a few narrow exceptions.

The United States Supreme Court has not directly addressed the issue in the present case, namely, the admissibility of first time in-court identifications under the suggestive circumstances of a trial. In addition, the United States Circuit Courts of Appeals have split on this issue.[16] See *United States* v. *Correa-Osorio*, supra, 784 F.3d 19–20 (noting circuit split regarding standard applicable to in-court identifications when claim is that trial setting is suggestive). After reviewing the federal jurisprudence on the admissibility of identification evidence, however, I conclude that first time in-court identifications are admissible and are not subject to prescreening. I further conclude that the approach that the majority adopts is an inappropriate prophylactic rule

under the fifth and fourteenth amendments. Cf. *Arkansas* v. *Sullivan*, 532 U.S. 769, 772, 121 S. Ct. 1876, 149 L. Ed. 2d 994 (2001) ("[although] a [s]tate is free *as a matter of its own law* to impose greater restrictions on police activity than those [that the United States Supreme] Court holds to be necessary [on the basis of] federal constitutional standards, it may not impose such greater restrictions as a matter of *federal constitutional law* when [the United States Supreme] Court specifically refrains from imposing them" [emphasis in original; internal quotation marks omitted]).

I do not dispute—nor could I—that in-court identifications are suggestive. Insofar as the majority suggests that all in-court identifications are unnecessarily suggestive, however, I do not agree. Additionally, I do not agree with the majority's suggestion that a comparative analysis of alternative identification procedures is the appropriate test for determining unnecessary suggestiveness. See *State* v. *Marquez*, supra, 291 Conn. 145 (concluding in slightly different context that "the test [for unnecessary suggestiveness] does not require a court to engage in a relative value judgment of various possible identification techniques and [to] settle on the one that it believes bears the least risk of mistake");[17] see also, e.g., *United States* v. *Correa-Osorio*, supra, 784 F.3d 21 ("[a]n in-court identification may be unduly suggestive if . . . the prosecutor drew the [witness'] attention to the defendant . . . or asked questions that suggested the hoped-for result, or if the defendant looked different from others in the courtroom or at counsel table when the identification occurred" [footnote omitted]); *United States* v. *Greene*, 704 F.3d 298, 307 (4th Cir.) (in-court identification was unnecessarily suggestive because prosecutor asked witness to look at defendant and to state to jury similarities witness observed between defendant and bank robber), cert. denied,     U.S.     , 134 S. Ct. 419, 187 L. Ed. 2d 279 (2013); *United States* v. *Murdock*, 928 F.2d 293, 297 (8th Cir. 1991) (defendant's "presence at the defense table, combined with his being the only African-American in the courtroom at the time of the identification," did not render first time in-court identification impermissibly suggestive). Moreover, whether a first time in-court identification is unnecessarily suggestive is not the salient question in the present case because due process does not protect against unnecessarily suggestive procedures. See *Neil* v. *Biggers*, supra, 409 U.S. 198. Instead, due process safeguards against convictions based on unreliable evidence. Id.

It is well established in our adversarial system that *the jury* determines issues of witness credibility and the reliability of evidence. See, e.g., *Kansas* v. *Ventris*, supra, 556 U.S. 594 n.* ("[o]ur legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses"); *United States* v. *Katsougrakis*, 715 F.2d 769, 777 (2d Cir. 1983)

("to require a preliminary assessment of the in-court witness' credibility would . . . be a usurpation of the jury function"), cert. denied, 464 U.S. 1040, 104 S. Ct. 704, 79 L. Ed. 2d 169 (1984); *State* v. *Rivera*, 268 Conn. 351, 372, 844 A.2d 191 (2004) ("[t]he determination of a witness' credibility is within the province of the jury"). Indeed, unreliable evidence is excluded by the courts, as a matter of constitutional law, "[o]nly when [such] evidence *is so extremely unfair* that its admission violates fundamental conceptions of justice . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Perry v. New Hampshire*, supra, 132 S. Ct. 723. Thus, the proper approach in this case, and similar cases, is to permit the in-court identification and then allow the jury, properly charged regarding the reliability issues of eyewitness testimony, to determine its worth.

As the United States Supreme Court recognized in *Perry*, moreover, a defendant's due process right to be free from conviction based on unreliable evidence is safeguarded by the mechanics of our adversarial system, not by the prescreening and suppression of purportedly unreliable evidence. Id., 723, 728. The United States constitution requires that criminal defendants be permitted to confront the witnesses against them and to have the effective assistance of counsel. Id., 728. Effective defense counsel can vindicate the defendant's confrontation rights by thoroughly cross-examining the identification witness. Id. Moreover, counsel can educate the jury regarding the fallibility of eyewitness evidence in closing arguments and direct the jury's attention to the particular factors that indicate that the in-court identification was unreliable. Id. The defendant also is protected by the presumption of innocence and the government's burden to establish guilt beyond a reasonable doubt. See id., 729. In addition, a defendant is entitled to identification-specific jury instructions. Id., 728–29. Such instructions direct the jury to consider the totality of the circumstances surrounding the eyewitness' identification in determining its reliability and convey to the jury the factors articulated in *Biggers*. See, e.g., Connecticut Criminal Jury Instructions 2.6-4 (revised to June 12, 2015), available at https://www.jud.ct.gov/JI/criminal/part2/2.6-4.htm. In fact, a defendant who is identified for the first time in court is likely entitled to an instruction regarding the suggestiveness of in-court identifications. Connecticut defendants are also permitted to present expert testimony on "the fallibility of eyewitness identification[s]"; *State* v. *Guilbert*, supra, 306 Conn. 221; and the factors that impact the reliability of such identifications. Id., 248. Indeed, we have characterized expert testimony on the reliability of eyewitness identification as "[a] highly effective safeguard against [wrongful convictions] . . . ." Id., 250. Finally, if defense counsel questions a witness' ability to make a reliable identification, he can ask the court to order the prosecutor to arrange an out-of-court iden-

tification procedure. See Practice Book §§ 40-34 and 40-38.[18]

I acknowledge that my conclusion in the present case may seem inconsistent with our case law requiring judicial prescreening of the reliability of unnecessarily suggestive out-of-court identifications. An identification made during an unnecessarily suggestive out-of-court identification procedure, however, is distinct from an identification made in court. The ills that gave the court pause in cases such as *Wade* and *Brathwaite* are not present when the first identification occurs in court *and in the presence of the judge, jury, and defense counsel.* For example, the court in *Wade* would exclude evidence of a lineup identification conducted without the presence of counsel and require screening of an in-court identification following such a lineup, due to the extreme difficulty of discerning, and recreating for the judge and jury, what occurred during the lineup. See *United States* v. *Wade*, supra, 388 U.S. 230. Moreover, an in-court identification following an uncounseled lineup is prescreened because the absence of counsel at the lineup deprives the defendant of an opportunity to effectively scrutinize the identification at trial. See id., 235. The court again, while discussing the reliability of identification evidence, voiced its concern regarding police manipulation of eyewitness recollection, intentional or not, during the identification procedure in *Manson* v. *Brathwiate*, supra, 432 U.S. 112, and, more recently, in *Perry*, the court highlighted the importance of police involvement in its previous identification cases. See *Perry* v. *New Hampshire*, supra, 132 S. Ct. 724–27. In the present case, however, none of these concerns appears. First, this is not an identification procedure arranged by the police. In fact, police officers took no part in the challenged identification, ensuring that officers did not distort the witness' recollection of the perpetrator. Second, the identification occurred before the judge, jury, and defense counsel, and, therefore, defense counsel's inability to recreate the identification or discern what occurred during the identification is no longer a factor. And, third, because the identification takes place in front of defense counsel, counsel is not hindered in his cross-examination of the identifying witness. If the jury is capable of evaluating the reliability of an inherently suggestive out-of-court identification not tainted by police misconduct, such as the identification in *Perry*, there is no reason to conclude that it is not equally capable of determining the reliability of an identification that transpires in its presence.

"It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is *still only evidence*, and, unlike the presence of counsel, is not a

factor that goes to the very heart—the integrity—of the adversary process.

"Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing [doubt] as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi [testimony]." (Footnote omitted; internal quotation marks omitted.) *Clemons* v. *United States*, 408 F.2d 1230, 1251 (D.C. Cir. 1968) (Leventhal, J., concurring), cert. denied, 394 U.S. 964, 89 S. Ct. 1318, 22 L. Ed. 2d 567 (1969).

In the absence of out-of-court misconduct by the state, I am of the opinion that the jury should be allowed to perform its rightful task in the American criminal justice system. "[I am] content to rely [on] the good sense and judgment of [Connecticut] juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson* v. *Brathwaite*, supra, 432 U.S. 116. There is no reason to assume that judges are better equipped to pass on the reliability of a first time in-court identification than are jurors. We presume that jurors follow instructions in other contexts. See, e.g., *State* v. *Wooten*, 227 Conn. 677, 694, 631 A.2d 271 (1993) ("[j]urors are presumed to follow the instructions given by the judge" [internal quotation marks omitted]). There is no reason to believe they do not follow eyewitness-specific instructions as well.

For the foregoing reasons, I respectfully concur in the judgment.

[1] I adopt the majority's terminology in that I use "first time in-court identification" to refer to instances "in which the witness has not successfully identified the defendant in a prior out-of-court identification procedure"; footnote 3 of the majority opinion; either because the witness did not have such opportunity or had the opportunity but nonetheless was unable to identify the defendant.

[2] In this opinion, I use the word "nonsuggestive" as the majority does, namely, to refer to an identification procedure that is not unnecessarily suggestive. See footnote 2 of the majority opinion. I also note that the majority does not—nor could it—overrule our existing case law regarding the admissibility of evidence of out-of-court identifications or in-court identifications that follow successful out-of-court identifications. Thus, if the nonsuggestive out-of-court identification required by the rule that the majority announces today is in fact an unnecessarily suggestive identification, a subsequent in-court identification is not necessarily inadmissible. Instead, the admissibility of such an identification will be determined by applying our current two-pronged test: "[F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and, second, *if it is found to have been so*, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 771, 99 A.3d 1130 (2014), cert. denied,     U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

[3] Notwithstanding my conclusion that the constitution does not require the prophylactic rule adopted by the majority, I would not join the majority opinion in the present case because the parties have not had the opportunity to brief the issue of whether to adopt such a rule, and, therefore, the ramifications of this new rule may not be fully appreciated.

[4] It would be imprudent for this court to create constitutional rules on the basis of evolving social science. Moreover, the social science regarding eyewitness identifications is not only evolving but *revolving*. For example, for years, law enforcement personnel utilized simultaneous identification procedures. Then, in 2012, the legislature required that all photographic arrays and live lineups be presented sequentially; see Public Acts 2012, No. 12-111, § 1, codified at General Statutes (Rev. to 2013) § 54-1p (c) (1); and this court recognized in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), that the consensus among social scientists and courts was that sequential identification procedures are more reliable than simultaneous procedures. See id., 237–38. Recently, however, some studies again favor the use of simultaneous lineups. See, e.g., *United States* v. *Johnson*, 745 F.3d 227, 229 (7th Cir. 2014) (noting that resent research "has called into question" view that sequential photographic identification procedures are superior to simultaneous photographic procedures); National Research Council et al., Identifying the Culprit: Assessing Eyewitness Identification (2014) pp. 83, 86 n.42 (observing that some recent studies indicate that simultaneous lineups have higher accuracy than sequential lineups and calling for more research). Thus, the federal courts, Congress, and law enforcement personnel should create prophylactic procedures, and this court should limit itself to remedying *actual* constitutional violations.

[5] In place of *Smith*, the defendant suggests three possible alternative approaches. First, the court could review the reliability of first time in-court identifications by utilizing the rules of evidence, as the Oregon Supreme Court did in *State* v. *Lawson*, 352 Or. 724, 737–39, 291 P.3d 673 (2012), and *State* v. *Hickman*, 355 Or. 715, 727–30, 330 P.3d 551 (2014), modified on other grounds, 356 Or. 687, 343 P.3d 634, cert. denied, U.S. , 136 S. Ct. 230, 193 L. Ed. 2d 173 (2015). Second, the court could prohibit all first time in-court identifications, except for good reason, an approach that the Supreme Judicial Court of Massachusetts adopted in *Commonwealth* v. *Crayton*, 470 Mass. 228, 241–42, 21 N.E.3d 157 (2014), and *Commonwealth* v. *Collins*, 470 Mass. 255, 261–62, 21 N.E.3d 528 (2014). Third, the court could review the reliability of first time in-court identifications using the factors that social science has identified as influencing the reliability of eyewitness identifications generally (system variables and estimator variables); see, e.g., *State* v. *Guilbert*, supra, 306 Conn. 236 n.11; or the court could apply the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), as it does when an identification follows an unnecessarily suggestive out-of-court identification procedure. Rather than adopt one of the tests that the defendant has presented, the majority decides to craft its own rule for prescreening the reliability of first time in-court identifications.

[6] Without addressing the doctrine of stare decisis, the majority overrules two of this court's previous decisions. First, the majority overrules *State* v. *Smith*, supra, 200 Conn. 469–70, insofar as it holds that an in-court identification will be excluded only when it follows an unnecessarily suggestive out-of-court identification that is conducive to irreparable misidentification. See footnote 5 of the majority opinion. Second, the majority overrules this court's holding in *State* v. *Tatum*, 219 Conn. 721, 595 A.2d 322 (1991), that a first time in-court identification during a probable cause hearing is not unnecessarily suggestive because, "[i]n order to try [a] defendant, it [is] necessary for the prosecution to present evidence at the preliminary hearing to establish probable cause to believe that [the defendant] . . . committed the crimes charged." (Emphasis omitted.) Id., 728; see part II of the majority opinion. I am troubled by the majority's decision to overrule these cases without first balancing the reliance interests that will be disturbed by overruling these cases against the costs of adhering to the holdings in *Smith* and *Tatum* in order to determine whether the dictates of stare decisis justify overruling those cases. See *State* v. *Peeler*, 321 Conn. 375, 469–70, A.3d (2016) (*Zarella, J.*, dissenting). By failing to address the principle of stare decisis, the majority creates the appearance that stare decisis is nothing more than "a doctrine of convenience" and that our determination of whether to adhere to the doctrine is "determined by the needs of the moment . . . ." (Internal quotation marks omitted.) Id., 440 n.5 (*Zarella, J.*, dissenting), quoting C. Cooper, "Stare Decisis: Precedent and Principle in Constitutional Adjudication," 73 Cornell L. Rev. 401, 402 (1988).

[7] As the thirteenth, fourteenth, and fifteenth amendments to the United States constitution make clear, when there is an intent to endow the government with power to create prophylactic constitutional rules or protections, the constitution so states. See U.S. Const. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation"); U.S. Const. amend. XIV, § 5 ("[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article"); U.S. Const. amend. XV, § 2 ("[t]he

Congress shall have power to enforce this article by appropriate legislation"). Thus, I suggest that no court, including this court, has the authority to craft such rules. See, e.g., *Dickerson* v. *United States*, 530 U.S. 428, 460, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (Scalia, J. dissenting) ("[when] the [c]onstitution has wished to lodge in one of the branches of the [f]ederal [g]overnment some limited power to supplement its guarantees, it has said so").

[8] A number of United States Supreme Court justices have voiced doubt concerning that court's authority to craft prophylactic rules. See, e.g., *Dickerson* v. *United States*, 530 U.S. 428, 446, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (Scalia, J., with whom Thomas, J., joins, dissenting) (if United States Supreme Court had prophylactic power "not merely to apply the [c]onstitution but to expand it," it would have "an immense and frightening antidemocratic power, and [that power] *does not exist*" [emphasis added]); id., 457 (Scalia, J., with whom Thomas, J., joins, dissenting) (characterizing court's prophylactic power as "a lawless practice"); *Oregon* v. *Elstad*, 470 U.S. 298, 348, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (Brennan, J., with whom Marshall, J., joins, dissenting) (citing with approval conclusion in *Michigan* v. *Tucker*, 417 U.S. 433, 94 S. Ct. 2357, 41 L. Ed. 2d 182 [1974], that court cannot craft prophylactic rules to support argument that violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966], is violation of constitution); *Oregon* v. *Elstad*, supra, 370–71 (Stevens, J., dissenting) (United States Supreme Court's "power to require state courts to exclude probative self-incriminatory statements rests entirely on the premise that the use of such evidence violates the [f]ederal [c]onstitution. . . . [Thus, if a violation of *Miranda* is not necessarily a violation of the constitution, the court] must regard the holding in the *Miranda* case itself, as well as all of the federal jurisprudence that has evolved from that decision, as nothing more than an illegitimate exercise of raw judicial power." [Footnote omitted.]); *Michigan* v. *Tucker*, supra, 462–63 (Douglas, J., dissenting) ("The [c]ourt is not free to prescribe preferred modes of interrogation absent a constitutional basis. [The court] held the requirement of warnings and waiver of rights [to be] fundamental with respect to the [f]ifth [a]mendment privilege . . . and without so holding we would have been powerless to reverse [the] conviction [in *Miranda*]." [Citation omitted; internal quotation marks omitted.]); *Michigan* v. *Tucker*, supra, 465–66 (Douglas, J., dissenting) ("*Miranda*'s purpose was not [the] promulgation of judicially preferred standards for police interrogation, a function we are quite powerless to perform"); *North Carolina* v. *Pearce*, 395 U.S. 711, 741, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969) (Black, J., concurring in part and dissenting in part) (agreeing that due process prohibits imposition of harsher sentence on defendant who successfully appeals conviction but who again is convicted after new trial merely to punish defendant for taking appeal, but arguing that court was "not vested with any general power to prescribe particular devices [for example, requiring sentencing judge to state reasons for more serve punishment affirmatively or requiring factual data supporting such reasons to be made part of the record] [i]n order to [en]sure the absence of such a motivation. . . . This is pure legislation if there ever was legislation." [Internal quotation marks omitted.]), overruled in part on other grounds by *Alabama* v. *Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). If there is question regarding the United States Supreme Court's authority to craft prophylactic constitutional rules, then, surely, it is not obvious that *this court* has such authority.

[9] I am not convinced that Justice Ginsburg "incorrectly assumed [in *Robinette*] both that prophylactic rules . . . are adopted pursuant to a court's supervisory powers and that supervisory rules adopted by the United States Supreme Court are binding on the states," as the majority contends. Footnote 11 of majority opinion. The United States Supreme Court had decided, before *Robinette*, that federal courts have no supervisory authority over state courts. See *Smith* v. *Phillips*, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("[f]ederal [c]ourts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension"); *Cupp* v. *Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973) ("Within . . . a unitary jurisdictional framework the appellate court . . . may . . . require [the trial court] to follow procedures deemed desirable from the viewpoint of sound judicial practice although in no-wise commanded by statute or by the [c]onstitution. . . . Before a federal court may overturn a conviction resulting from a state trial [however] . . . it must be established . . . that [the state trial court] violated some right [that] was guaranteed to the defendant by the [f]ourteenth [a]mendment."). Thus, if Justice Ginsburg believed that prophylactic rules could be applied to the states, which she did, then she must have understood that not *all* prophylactic rules, especially those developed under the federal constitution, were derived from the adopting court's supervisory powers. Even if Justice Ginsburg did so assume, I doubt that would impact her

ultimate suggestion in *Robinette*, namely, that, if state courts, in order to protect constitutional rights, wish to craft rules that sweep further than the federal constitution—the defining characteristic of a prophylactic rule—they must base such a rule on independent state law. See *Ohio* v. *Robinette*, supra, 519 U.S. 42–43 (Ginsburg, J., concurring in the judgment).

[10] Although this court cannot craft prophylactic rules under the federal constitution, that does not mean the majority is without recourse to redress the purported constitutional violation. When evidence is secured in a criminal trial as a consequence of a violation of one or more of the defendant's constitutional rights, the remedy is suppression of such evidence *after* the trial court has determined that such evidence was procured on the basis of such a violation. Thus, if I agreed with the majority that first time in-court identifications implicate due process and, therefore, required prescreening—which I *do not*—I would likely conclude that the proper redress would be to conduct a hearing pursuant to *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), prior to allowing a first time in-court identification in those cases in which the defendant challenges the witness' ability to make a reliable first time in-court identification. Moreover, in the present case, if the majority were to conclude that the first time in-court identification in fact violated the defendant's due process rights—a determination it has *not* made—and that the admission of such identification was not harmless beyond a reasonable doubt, the remedy would be to remand the case for a new trial in which the witness would not be allowed to make such an in-court identification.

[11] The defendant has alleged a violation of only his due process rights as guaranteed by the fifth and fourteenth amendments to the United States constitution, and he has made no claims under article first, § 8, of the Connecticut constitution. Thus, our review in this case is limited to the federal constitution, and, therefore, the court's decision must be guided in the first instance by the decisions of the United States Supreme Court. See *Wojculewicz* v. *Cummings*, 143 Conn. 624, 629, 124 A.2d 886 (1956) ("[S]ince the plaintiff relies on his rights under the federal constitution . . . we are, in passing [on] his claims in that regard, bound to accept the law as formulated by the Supreme Court of the United States. . . . Decisions of that court which construe the constitution of the United States are absolutely binding on us." [Citation omitted.]). Even if the defendant had argued that the Connecticut constitution provides greater due process protections than does the federal constitution, it is unlikely that he could have prevailed on that claim. See *State* v. *Ledbetter*, supra, 275 Conn. 568 (concluding that Connecticut constitution provides no greater protection than the federal constitution in context of reliability of eyewitness identifications).

[12] I cannot overstate enough that reliability is a jury question, and a major flaw in the majority's opinion is its failure to give this principle sufficient weight.

[13] The court also noted that a strict exclusionary rule could be justified on the basis of deterring police officers from using less reliable identification procedures when more reliable procedures are available. See *Neil* v. *Biggers*, supra, 409 U.S. 199. Nevertheless, adopting such a rule in *Biggers* would be inappropriate, the court concluded, because the identification at issue and the underlying trial were conducted before the court's decision in *Stovall*. Id.

[14] Between *Biggers* and *Perry*, the United States Supreme Court did address identification evidence in another case, namely, *Watkins* v. *Sowders*, 449 U.S. 341, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981). In *Watkins*, the court held that, although it may be prudent for trial courts to determine admissibility of identification evidence after an evidentiary hearing outside the jury's presence, "it does not follow that the [c]onstitution requires a per se rule compelling such a procedure in every case." Id., 349.

[15] Admittedly, the first step in the majority's test is similar to the approach that the Supreme Judicial Court of Massachusetts adopted in *Commonwealth* v. *Crayton*, 470 Mass. 228, 241–42, 21 N.E.3d 157 (2014), and *Commonwealth* v. *Collins*, 470 Mass. 255, 261–62, 21 N.E.3d 528 (2014). If the prosecution wants to introduce a first time in-court identification, it first must seek permission from the court to do so. See *Commonwealth* v. *Crayton*, supra, 243 (requiring prosecution "to move in limine to admit the in-court identification" when witness has not made out-of-court identification of defendant). The trial court should grant such motion if the identity of the defendant or the witness' ability to identify the defendant is not at issue. See id., 242–43 (holding that defendant has burden to establish that there is no good reason for admission of in-court identification and noting that "there may be good reason . . . [when] the eyewitness was familiar with the defendant before the commission of the crime . . . [or when] the witness is

an arresting officer who was also an eyewitness to the commission of the crime, and the identification merely confirms that the defendant is the person who was arrested for the charged crime" [citations omitted; internal quotation marks omitted]). It is the next step in the majority's approach, namely, the requirement of a nonsuggestive out-of-court identification if the first time in-court identification cannot be admitted, that diverges from the test adopted in *Crayton* and *Collins*. See id., 241 (prohibiting first time in-court identification if there is no "good reason"). Although the majority's approach is preferable to the approach that the Supreme Judicial Court of Massachusetts adopted, I do not believe it is supported by the United States Supreme Court's case law and, therefore, is an inappropriate prophylactic rule under the fifth and fourteenth amendments.

[16] The federal circuit courts of appeals have approached the issue of first time in-court identifications in varying ways. The Eleventh Circuit Court of Appeals has determined that first time in-court identifications are *not* subject to judicial prescreening. *United States* v. *Whatley*, 719 F.3d 1206, 1216 (11th Cir.) (observing that *Perry* abrogated earlier Eleventh Circuit cases that applied *Biggers* approach to first time in-court identifications), cert. denied, U.S. , 134 S. Ct. 453, 187 L. Ed. 2d 303 (2013). Instead, that circuit has decided that, for a defendant "who [is] identified under suggestive circumstances not arranged by [the] police, the requirements of due process are satisfied in the ordinary protections of trial." Id.

Conversely, a majority of the circuit courts—seven to be exact—apply the *Biggers* approach to first time in-court identifications. That is, they first review whether the in-court identification is *unnecessarily* suggestive. If it is, they then determine whether the identification nonetheless has indicia of reliability, using the *Biggers* factors. See, e.g., *Lee* v. *Foster*, 750 F.3d 687, 690–91 (7th Cir. 2014) (utilizing two-pronged *Biggers* test to determine admissibility of in-court identification when witness failed to identify defendant in photographic array just eleven days before trial); *United States* v. *Greene*, supra, 704 F.3d 304–10 (identification witness did not identify defendant in or out of court but provided " 'resemblance' " testimony by describing similarities between defendant and perpetrator, and court treated this evidence as in-court identification and applied *Biggers* test to determine admissibility); *United States* v. *Jones*, 126 Fed. Appx. 560, 567–68 (3d Cir.) (applying *Biggers* factors to in-court identification in case involving witness who failed to identify defendant in photographic array conducted six months after crime but who, upon viewing defendant when entering courtroom, informed prosecutor that she could identify defendant as perpetrator and was subsequently asked to make such identification in court), cert. denied, 546 U.S. 966, 126 S. Ct. 494, 163 L. Ed. 2d 374 (2005); *United States* v. *Brown*, 200 F.3d 700, 707 (10th Cir. 1999) (noting that first time in-court identification is permissible if, under *Biggers*, it has indicia of reliability, and stating that "the inability [of a witness] to identify a defendant from a photo[graphic] array does not render a subsequent in-court identification inadmissible . . . [but] that inability goes to the weight of the [witness'] testimony"), cert. denied, 528 U.S. 1178, 120 S. Ct. 1213, 145 L. Ed. 2d 1114 (2000), and cert. denied sub nom. *Dixon* v. *United States*, 529 U.S. 1081, 120 S. Ct. 1706, 146 L. Ed. 2d 509 (2000); *United States* v. *Rogers*, 126 F.3d 655, 657–59 (5th Cir. 1997) (reviewing, under *Biggers* test, admission of first time in-court identification by witness who was not originally expected by prosecution to identify defendant); *United States* v. *Kime*, 99 F.3d 870, 882–83 (8th Cir. 1996) (reviewing admissibility of first time in-court identification under *Biggers* framework), cert. denied, 519 U.S. 1141, 117 S. Ct. 1015, 136 L. Ed. 2d 892 (1997), and cert. denied sub nom. *Bell* v. *United States*, 520 U.S. 1220, 117 S. Ct. 1714, 137 L. Ed. 2d 838 (1997); *United States* v. *Hill*, 967 F.2d 226, 232 (6th Cir.) ("[w]e hold that the *Biggers* analysis applies to [first time] in-court identifications for the same reasons that the analysis applies to impermissibly suggestive [pretrial] identifications"), cert. denied, 506 U.S. 964, 113 S. Ct. 438, 121 L. Ed. 2d 357 (1992).

The Ninth Circuit Court of Appeals has determined that *Stovall* and its progeny, including *Biggers*, do not extend to first time in-court identifications. See *United States* v. *Domina*, 784 F.2d 1361, 1368–69 (9th Cir. 1986), cert. denied, 479 U.S. 1038, 107 S. Ct. 893, 93 L. Ed. 2d 845 (1987). Instead, that circuit reviews the admission of first time in-court identifications for an abuse of discretion, which occurs "if the resulting in-court identification procedures are so unnecessarily suggestive and conducive to irreparable misidentification as to amount to a denial of due process of law . . . ." (Internal quotation marks omitted.) Id., 1369; see also id. (noting that "[t]here is no constitutional entitlement to an in-court [lineup] or other particular

methods of lessening the suggestiveness of in-court identification[s]").

The Second Circuit Court of Appeals has adopted an approach similar to the majority approach, with a unique variation. That circuit, like the majority, reviews first time in-court identifications under the *Biggers* two-pronged framework. See *United States* v. *Matthews*, 20 F.3d 538, 547 (2d Cir. 1994). In the Second Circuit, however, defendants can request less suggestive identification procedures, such as being placed in a lineup prior to the in-court identification or being seated somewhere other than at the counsel table. Id.; see also *United States* v. *Archibald*, supra, 734 F.2d 940–43. The First Circuit Court of Appeals has not adopted a standard for reviewing first time in-court identifications. See *United States* v. *Correa-Osorio*, supra, 784 F.3d 20. That court has indicated, however, that either the approach of *Perry* or *Biggers* applies to first time in-court identifications. See id., 19–20. It does not appear that the District of Columbia Circuit Court of Appeals has addressed the issue.

Although a majority of the circuit courts apply the *Biggers* approach to first time in-court identifications, most of those circuit courts have not addressed this issue since the United States Supreme Court's decision in *Perry*. In fact, only three circuit courts have had the opportunity to review first time in-court identifications since then. As I just noted, the First Circuit did not determine which standard should apply. See id., 20. The Seventh Circuit Court of Appeals decided that *Biggers* should apply. See *Lee* v. *Foster*, supra, 750 F.3d 690–91. It does not appear, however, that it considered whether *Perry* should apply instead. See id. Finally, the Eleventh Circuit adopted the approach in *Perry*, repudiating its earlier cases applying *Biggers*. *United States* v. *Whatley*, supra, 719 F.3d 1216. Moreover, other circuit courts have indicated that, perhaps, in light of *Perry*, first time in-court identifications should not be judicially prescreened. See, e.g, *United States* v. *Hughes*, 562 Fed. Appx. 393, 398 (6th Cir. 2014) (observing that prevailing authority was against defendant's claim that in-court identification was unduly suggestive because he was only African-American in court room other than Assistant United States Attorneys and United States Marshal, and further noting that "the [United States] Supreme Court has recently made clear [in *Perry*] that due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial"), cert. denied,      U.S.     , 135 S. Ct. 1188, 191 L. Ed. 2d 143 (2015); see also *Benjamin* v. *Gipson*, 640 Fed. Appx. 656, 659 (9th Cir. 2016) (noting that "courts suppress eyewitness identifications only when they are the product of improperly suggestive conduct by the police").

[17] I recognize that *Marquez* involved a photographic array and that the defendant in that case argued that the array was unnecessarily suggestive because the photographs were shown simultaneously, rather than sequentially, and the procedure was merely single, rather than double, blind. See *State* v. *Marquez*, supra, 291 Conn. 132–33, 146. Thus, the comparative judgment we were asked but declined to make in that case was between a double-blind, sequential photographic array and a single-blind, simultaneous photographic array, not a photographic array and some other identification procedure, such as a live lineup. See id. Nevertheless, I think the logic and theory espoused in *Marquez* equally apply in the present case and to in-court identifications.

[18] *Perry* may govern for an additional reason. In that case, the United States Supreme Court held that, "[w]hen no improper law enforcement activity is involved . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Perry* v. *New Hampshire*, supra, 132 S. Ct. 721. As I previously noted; see footnote 16 of this opinion; at least one court has read *Perry* to hold that identifications not procured through suggestive procedures arranged by the police are admissible, and the defendant's due process rights are protected through the ordinary protections of our adversarial system. See *United States* v. *Whatley*, 719 F.3d 1206, 1216 (11th Cir.), cert. denied,      U.S.     , 134 S. Ct. 453, 187 L. Ed. 2d 303 (2013). The majority rejects this possibility by stating that it "[does] not believe that the court's repeated statements [in *Perry*] that due process protections are triggered only when unduly suggestive identification procedures are arranged by the police means that due process protections are not triggered when state actors other than the police conduct unfair identification procedures. Indeed,

the court in *Perry* expressly stated that its prior decisions on this issue 'turn on the presence of state action' . . . and . . . the state in the present case does not dispute that a prosecutor's conduct in court constitutes state action." (Citation omitted; emphasis omitted.) Part II of the majority opinion. Certainly, the court in *Perry* did use state action and police conduct interchangeably. On the other hand, the majority overstates the state's concession regarding state action. In fact, the state contends that "the [United States Supreme] Court clearly mean[t] to signify police or other law enforcement actors involved in *extrajudicial* investigation, *not* prosecutors presenting evidence in court." (Emphasis added.) The state further claims that *Perry* cannot be read to mean that the presentation of evidence in court by a prosecutor is the kind of state action that triggers the *Biggers* due process protections. The state may be correct. If the majority's reading of *Perry* is correct, it produces a confounding result. I can think of no reasonable basis for distinguishing between the state action of a prosecutor entering into evidence a suggestive out-of-court identification, not arranged by law enforcement, and the state action of a prosecutor eliciting a first time in-court identification.